**Case No. 25-1161**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

-------------------------------------------------------------------------------------

**ESTATE OF WILFORD DEWEESE,**
*Plaintiff-Appellant,*

**v.**

**RONNIE HANCOCK, DANIEL LEBARON, LEVI HOOVER, and
JEFFREY SCHUELKE**
*Defendant-Appellees.*

On Appeal from the United States District Court
For the District of Colorado
The Honorable Judge Daniel Domenico
District Court Civ. Action No. 1:24-CV-00960-DDD-NRN

**OPENING BRIEF OF APPELLANT**

Respectfully submitted,

CIVIL RIGHTS LITIGATION GROUP, LLP

Raymond K. Bryant
Attorney for Plaintiff-Appellant
Estate of Wilford Deweese
1543 Champa St., Ste. 400
Denver, CO 80202
raymond@rightslitigation.com
(720) 515-6165

July 31, 2025

**ORAL ARGUMENT IS REQUESTED**

i

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..........................................................................vi

STATEMENT OF RELATED CASES ....................................................... 1

STATEMENT OF JURISDICTION .......................................................... 2

STATEMENT OF THE ISSUES ................................................................ 3

STATEMENT OF THE CASE.................................................................... 4

SUMMARY OF THE ARGUMENT .........................................................8

STANDARD OF REVIEW...................................................................... 10

ARGUMENT ...........................................................................................11

I.   The District Court Interpreted Key Facts in a Light Most Favorable to
     the Defense, Which Infected Its Analysis. ..........................................11

     1.   The District Court Wrongly Concluded that Deweese Shot
          First. ...........................................................................................11

     2.   The District Court Improperly Speculated About Nonexistent
          Dangers. .................................................................................... 12

     3.   The District Court Improperly Inferred a Lack of Impairment
          to Distinguish Controlling Precedent.................................... 13

     4.   Broad Deference to Hasty Judgments is Inappropriate Where
          Officers Create Their Own Urgency. ...................................... 14

II.  The District Court Conflated and Confused the Qualified Immunity
     Analysis Between the Constitutional Violations at Issue....................15

     1.   The District Court Failed to Analyze the Canine Attack Under
          the Correct Body of Law. ......................................................... 16

     2.   The District Court Failed to Consider the Reckless Incitement
          Doctrine to Evaluate the Use of Deadly Force..........................17

     3.   The District Court Erred by Requiring a Predicate "Clearly
          Established Violation" for the Reckless Incitement Claim...... 18

III. Defendant Officers' Use of Force Was Objectively and Egregiously
     Unreasonable. ...................................................................................... 18

ii

1.  Defendant Officers Used Excessive Force When They Deployed a Police Canine to Attack an Idle, Non-Threatening Subject..20

    a.  *Graham* analysis re: canine—severity of the crime at issue. ............................................................................20

    b.  *Graham* analysis re: canine—the "immediate threat" factor weighs decisively against the use of force. ........23

    c.  *Graham* analysis re: canine—Deweese did not flee or actively resist arrest. ...................................................25

    d.  The district court assumed "active resistance" meant something different than decades of precedent reflect. ................................................................................27

2.  Defendant Officers Used Excessive Deadly Force When They Shot Mr. Deweese Over 40 Times Because He Pointed a Firearm at a Canine in Self-Defense........................................30

    a.  *Graham* analysis re: shooting—severity of the crime at issue. ............................................................................30

    b.  *Graham* analysis re: shooting—Deweese presented no imminent threat to human life. ...................................30

    c.  *Graham* analysis re: shooting—Deweese did not flee or actively resist arrest when shot...................................35

3.  Defendant Officers Are Liable for Recklessly Creating the Need for Deadly Force by Inciting Deweese to Defend Himself.......36

IV. Defendant Officers' Conduct Violated Clearly Established Law........37

1.  Canine Force was Clearly Prohibited by Direct, On-Point, Tenth Circuit Authority, and by the Prevailing Weight of Authority from Other Courts In and Out of this Circuit..........40

    a.  On-point Tenth Circuit precedent established that attacking a non-threatening suspect is unconstitutional. ................................................................................40

    b.  The prevailing weight of other district courts within circuit. .........................................................................41

    c.  Prevailing weight of other circuit court decisions. ......42

2.  Deadly Force was Fairly Prohibited by Clear Tenth Circuit Principles and Analogous Examples. .......................................43

a. The right not to be shot while posing no immediate threat was clearly established. ..................................... 43

b. The distinction between holding a weapon and making hostile threats toward officers with it was clearly established. ................................................................ 44

c. The unconstitutionality of the shooting was obvious. . 46

3. The Law on Reckless Incitement was Clearly Established in Light of Tenth Circuit Principles and Analogous Tenth Circuit Authority. ............................................................... 47

a. Tenth Circuit precedent clearly established that a "police onslaught" provoking a defensive reaction is unconstitutional. .......................................................... 47

b. Tenth Circuit precedent clearly established that antagonizing an armed subject into acting aggressively is unconstitutional. ..................................................... 48

c. Tenth Circuit precedent clearly established that anticipating self-defensive responses must be performed to avoid unconstitutional reckless incitement. ................................................................. 50

d. The district court's attempts to distinguish this precedent fail. ............................................................ 51

V. The District Court Failed to Recognize or Apply Clear Legal Principles that Highlighted the "Obviousness" of the Constitutional Violations at Issue. ................................................................................ 53

1. The Legitimate Justification Rule Obviously Made Clear the Canine Attack Was Unconstitutional. ................................... 55

2. Disturbingly Disproportionate Force is Obviously Unconstitutional. ........................................................................ 57

3. Deadly Force Without Probable Cause of an Immediate Threat to Human Life is Obviously Unconstitutional. ........................ 60

4. Deadly Force Without a Warning (where feasible) Obviously Violates the Constitution. ........................................................ 61

STATEMENT REGARDING ORAL ARGUMENT ................................... 62

CERTIFICATE OF COMPLIANCE ......................................................... 63

CERTIFICATES OF DIGITAL SUBMISSION ......................................... 64

iv

CERTIFICATE OF SERVICE ....................................................................... 65

ATTACHMENTS:

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ...............................A

FINAL JUDGMENT .........................................................................................B

# <u>TABLE OF AUTHORITIES</u>

## Constitutional Provision

U.S. Const. amend. IV ................................................................. 2

## Federal Cases

*A.N. by and through Ponder v. Syling,* 928 F.3d 1191 (10th Cir. 2019) 55, 61

*Aldaba v. Pickens,* 777 F.3d 1148 (10th Cir. 2015) ...................................... 26

*Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997)14, 16, 47, 48, 49, 51, 52, 53

*American Canine Foundation v. City of Aurora, Colo.,* 618 F. Supp. 2d 1271

  (D. Colo. 2009) ............................................................................. 23

*Anderson v. DelCore,* 79 F.4th 1153 (10th Cir. 2023) ..................... 27, 28, 49

*Arnold v. City of Olathe, Kan.*, 35 F.4th 778 (10th Cir. 2022) .............. 47, 52

*Baca v. Cosper,* 128 F.4th 1319 (10th Cir. 2025) ......................................... 44

*Barnes v. Felix*, 145 S. Ct. 1353 (2025) ................................................ 1, 13, 24

*Bella v. Chamberlain*, 24 F.3d 1251 (10th Cir. 1994) ............................ 16, 25

*Blackmore v. Carlson*, No. 2:21-CV-00329, 2024 WL 2883010 (D. Utah

  June 7, 2024) .................................................................................. 29

*Bond v. City of Tahlequah*, 981 F.3d 808 (10th Cir. 2020) ....... 47, 48, 49, 51

*Bridges v. Yeager*, 352 F.Appx. 255 (10th Cir. 2009) ................................ 26

*Browder v. City of Albuquerque*, 787 F.3d 1076 (10th Cir. 2015) .............. 46

*Brown v. Whitman*, 651 F. Supp. 2d 1216 (D. Colo. 2009)..........................42

*Buck v. City of Albuquerque,* 549 F.3d 1269 (10th Cir. 2008)...............19, 56

*Campbell v. City of Springboro*, 700 F.3d 779 (6th Cir. 2012)...................43

*Casey v. City of Federal Heights,* 509 F.3d 1278 (10th Cir. 2007) 19, 30, 35, 39, 41, 56

*Cavanaugh v. Woods*, 625 F.3d 661 (10th Cir. 2010)..........19, 24, 30, 41, 56

*Chew v. Gates,* 27 F.3d 1432 (9th Cir. 1994)................................... 27, 43, 59

*City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600 (2015)............. 12

*City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021) .......................................1, 47

*City of Tahlequah v. Bond*, 595 U.S. 9 (2021)..............................................36

*Clerkley v. Holocomb,* 121 F.4th 1359 (10th Cir. 2024)...... 35, 39, 40, 57, 60

*Cole v. Carson,* 935 F.3d 444 (5th Cir. 2019)............................................. 61

*Cook v. City of Albuquerque*, 639 F. Supp. 3d 1185 (D.N.M. 2022) ...........42

*Cook. v. City of Arvada,* 2021 WL 243451 (D. Colo. Jan. 25, 2021) ...........56

*Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016) ..........................................43

*Cooper v. Sheehan,* 753 F.3d 153 (4th Cir. 2013)........................................45

*Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009) ........................32, 37, 61

*Cortez v. McCauley,* 478 F.3d 1108 (10th Cir. 2007)............... 10, 20, 24, 27

*Davis v. Clifford,* 825 F.3d 1131 (10th Cir. 2016)........................................58

*Deorle v. Rutherford,* 272 1272 (9th Cir. 2001)........................................... 61

*District of Columbia v. Heller,* 554 U.S. 570 (2008) ...................... 21, 22, 50

*Dixon v. Richer,* 992 F.2d 1456 (D. Colo. 2020) ......................................... 56

*Emmett v. Armstrong*, 973 F.3d 1127 (10th Cir. 2020) .............................. 25

*Erickson v. City of Lakewood*, 489 F. Supp. 3d 1183 (D. Colo. 2020) ........ 42

*Est. of Booker v. Gomez,* 745 F.3d 405 (10th Cir. 2014) ............................. 42

*Est. of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019)... 16, 20, 38, 47, 48, 49, 52, 53

*Est. of Harmon v. Salt Lake City,* 134 F.4th 1119 (10th Cir. 2025). 33, 35, 44

*Est. of Larsen ex rel. Sturdivan v. Murr,* 511 F.3d 1255 (10th Cir. 2008) . 12, 32

*Est. of Taylor v. Salt Lake City*, 16 F.4th 744 (10th Cir. 2021) .18, 21, 36, 48, 49

*Est. of Thakuri v. City of Westminster*, 19-CV-02412-DDD-KAS, 2024 WL 1152565 (D. Colo. Mar. 14, 2024) .............................................................. 49

*Est. of Valverde v. Dodge*, 967 F.3d 1049 (10th Cir. 2020) ........................ 31

*Finch v. Rapp,* 38 F.4th 1234 (10th Cir. 2022) ............................... 43, 45, 46

*Flores v. Henderson*, 101 F.4th 1185 (10th Cir. 2024) ........... 1, 18, 36, 43, 47

*Frasier v. Evans*, 992 F.3d 1003 (10th Cir. 2021) ...................................... 54

*Fuqua v. Santa Fe County Sheriff's Office,* 2025 WL 1331667 (D.N.M. 2025) ........................................................................................................... 53

*Gann v. Cline,* 519 F.3d 1090 (10th Cir. 2008) ...........................................38

*Graham v. Connor,* 490 U.S. 386 (1989).............................................20, 25

*Halley v. Huckaby,* 902 F.3d 1136 (10th Cir. 2018) ...................................54

*Herrera v. Bernalillo Cnty. Bd. Of Cnty. Comm'rs*, 361 F.Appx. 924 (10th

 Cir. 2010) ...................................................................................... 25

*Hope v. Pelzer,* 536 U.S. 730 (2002).............................................................54

*Ibarra v. Lee,* 135 F.4th 1257 (10th Cir. 2025)......................................25, 43

*Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022).................................42, 43

*Jordan v. Jenkins,* 73 F.4th 1162 (10th Cir. 2023)......................................25

*Katterman v. Salt Lake Cnty.*, No. 2:13-CV-1122, 2017 WL 1207518 (D.

 Utah Mar. 31, 2017) .........................................................................42

*King v. Hill,* 615 F. App'x 470 (10th Cir. 2015) ..........................................38

*Kolender v. Lawson*, 461 U.S. 352 (1983)............................................29, 30

*Landon v. City of North Port*, 745 F.Appx. 130 (11th Cir. 2018)............26, 43

*Lowe v. Raemisch*, 864 F.3d 1205 (10th Cir. 2017) ....................................38

*Luethje v. Kyle,* 131 F.4th 1179 (10th Cir. 2025).........................19, 38, 40, 57

*Lundstromo v. Romero,* 616 F.3d 1108 (10th Cir. 2010) ............................20

*Mayfield v. Bethards,* 826 F.3d 1252 (10th Cir. 2016) ...............................39

*McCowan v. Morales,* 945 F.3d 1276

 (10th Cir. 2019)..................................................... 38, 50, 54, 56

*McCoy v. Alamu,* 141 S. Ct. 1364 (2021) ...................................................... 54

*McCoy v. Meyers,* 887 F.3d 1034 (10th Cir. 2018) ................................. 40, 56

*Miller v. Clark,* 340 F.3d 959 (9th Cir. 2003) ............................................. 59

*Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012) ................................. 35, 41, 56

Mullenix v. Luna, 136 S.Ct. 305 (2015) ...................................................... 38

*Mullins v. City of Boulder*, 575 F. Supp. 3d 1360 (D. Colo. 2021) .............. 42

*Mundt v. Gadziala,* No. 24-1041, 2024 WL 5087212 (10th Cir. 2024) ........ 11

*Myers v. Brewer,* 773 Fed. App'x 1032 (10th Cir. 2019) .................. 21, 26, 33

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, (2022)

........................................................................................................... 21

*Nosewicz v. Janosko*, 754 F. App'x 725 (10th Cir. 2018) ............................ 26

*Oliver v. Woods*, 209 F.3d 1179 (10th Cir. 2000) .......................................... 27

*Palacious v. Fortuna,* 61 F.4th 1248 (10th Cir. 2023) ................................ 61

*Pauly v. White*, 874 F.3d 1197 (10th Cir. 2017).. 14, 17, 18, 33, 34, 37, 43, 45, 46, 47, 48, 49, 50, 53, 60

*Pearson v. Callahan,* 555 U.S. 223 (2009) .................................................. 19

*Perea v. Baca,* 817 F.3d 1198 (10th Cir. 2016) ...................................... 41, 58

*Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513 (7th Cir. 2012) .......................... 26

*Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004) .............................. 40, 54

*Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000) ............... 43

*Reavis Est. of Coale v. Frost,* 967 F.3d 978 (10th Cir. 2020) ............... 39, 44

*Robinette v. Barnes,* 854 F.2d 909 (6th Cir. 1988) ..................................... 59

*Rocky Mountain Wild v. Dallas*, 98 F.4th 1263 (10th Cir. 2024) ............... 29

*Rosales v. Bradshaw,* 72 F.4th 1145 (10th Cir. 2023)... 18, 31, 33, 34, 35, 45, 46, 47, 49, 53, 60

*Samuel v. City of Broken Arrow,* 506 F. App'x 751 (10th Cir. 2012) .......... 61

*Scherbarth v. Woods,* 2020 WL 1538755 (D. Colo. May 31, 2020) ............ 56

*Sentell v. New Orleans & C.R. Co.,* 166 U.S. 698 (1897) ....................... 23, 25

*Sevier v. City of Lawrence*, 60 F.ed 695 (10th Cir. 1995) ........................... 49

*Shepherd v. Robbins*, 55 F.4th 810 (10th Cir. 2022) .................................. 38

*Simpson v. Little,* 16 F.4th 1353 (10th Cir. 2021) ...................................... 39

*St. George v. City of Lakewood*, No. 20-1259, 2021 WL 3700918 (10th Cir. Aug. 20, 2021) (unpublished) ...................................... 15, 31, 33, 45, 47, 49

*Story v. Taylor*, 696 F.3d 987 (10th Cir. 2012) ........................................... 29

*Surat v. Klamser,* 52 F.4th 1261, 1273 (10th Cir. 2022) ....................... 22, 58

*Taylor v. Riojas*, 592 U.S. 7, (2020) ........................................................... 54

*Teetz v. Stepien*, -- F.4th --, 2025 WL 1728527 (10th Cir. June 23, 2025) ... 7

*Tennessee v. Garner*, 471 U.S. 1 (1985) ................................................. 31, 61

*Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015) ...................................... 44

*Thomson v. Salt Lake Cty.*, 584 F.3d 1304 (10th Cir. 2009) ................. 17, 18

*Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) .............. 43

*Trujillo v. City of Albuquerque*, No. CIV 08-0531, 2009 WL 3260724

  (D.N.M. Sept. 11, 2009) ........................................................................... 42

*Turman v. Orem City,* 1 F.4th 1227 (10th Cir. 2021) .................................. 54

*United States v. Dillard,* 795 F.3d 1191 (10th Cir. 2015) ....................... 22, 24

*United States v. Hensley*, 469 U.S. 221 (1985) .............................................. 27

*United States v. Romero,* 935 F.3d 1124 (10th Cir. 2019) ........................... 28

*United States v. Sharpe*, 470 U.S. 675 (1985) .............................................. 29

*Vera Cruz v. City of Escondido,* 139 F.3d 659 (9th Cir. 1997) ................... 59

*Vette v. K-9 Deputy Sanders,* 989 F.3d 1154 (10th Cir. 2021) .. 19, 23, 24, 41,

  55, 57, 59

*Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998) ....................... 59

*Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) ................................... 15, 56

*White v. Pauly*, 580 U.S. 73 (2017) ........................................................... 1, 55

*Winston v. Lee*, 470 U.S. 753 (1985) ........................................................... 58

*Young v. Cnty. Of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011) ................... 26

## State Cases

*People v. Fuller*, 781 P.2d 647, 650 (Colo. 1989) ................................... 22, 31

*Thiele v. City & County of Denver,* 312 P.2d 786 (Colo. 1957) ................... 23

## Statutes

28 U.S.C. § 1291 ................................................................. 2

28 U.S.C. § 1331 ................................................................. 2

42 U.S.C. § 1983 ................................................................. 2

C.R.S. § 18-1-704 .............................................................. 22

C.R.S. § 18-3-206 ..........................................................23, 31

C.R.S. § 18-9-202 ...................................................22, 23, 25, 31

## Rules

10th Cir. R. 28.2(c)(1) ......................................................... 1

Fed. R. App. P. 32 .............................................................. 63

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to 10th Cir. R. 28.2(c)(1) there are no prior appeals in this action.

The Supreme Court recently declined to resolve the "creation of danger" question raised in *Barnes v. Felix*, 145 S. Ct. 1353, 1360 (2025). Just as it did in *White v. Pauly*, 580 U.S. 73, 81 (2017), and *City of Tahlequah v. Bond*, 142 S. Ct. 9, 12 (2021), it did not overrule the underlying theory. *Barnes*, 145 S. Ct. at 1360. Therefore, this Court's precedent holding officers accountable for recklessly creating the need for force remains binding. *Flores v. Henderson*, 101 F.4th 1185, 1194 (10th Cir. 2024) (courts "must also consider whether an officer's 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'").

## <u>STATEMENT OF JURISDICTION</u>

This is an appeal from a final judgment entered March 21, 2025, dismissing the Estate's claims for excessive force, conspiracy, and failure to intervene. J.A. 135; Doc. 47. [1]

The district court had federal question jurisdiction under 28 U.S.C. § 1331 over these claims, which arise under the Fourth Amendment and 42 U.S.C. § 1983. The court declined supplemental jurisdiction over the state law claims, and those claims are not at issue.

The Estate filed a timely notice of appeal on April 18, 2025. (Doc. 49). This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] "J.A. [Bates no.]" refers to the consecutively paginated Joint Appendix. The parties conferred and agreed to the materials submitted.

2

## <u>STATEMENT OF THE ISSUES</u>

Whether the district court erred in concluding that defendant officers were entitled to qualified immunity on Plaintiff's excessive force claims.

## <u>STATEMENT OF THE CASE</u>

On April 12, 2022, Officers Hoover and Schuelke responded to a 911 call about a man who had displayed a gun at the Royal Tavern but harmed no one. (J.A. 8, ¶¶ 43–49). The incident involved no unprovoked threat. Hostile patrons had pushed Wilford Deweese to the ground; he attempted to draw a gun for protection, but it caught on his pants, so he left to avoid confrontation. (J.A. 8, ¶¶ 43–48). Though police lacked complete details, their information suggested self-defense, not criminal aggression. (J.A. 8, ¶¶ 43–48, 67, 70–71).

Officers located Mr. Deweese standing calmly in a courtyard. (J.A. 8, ¶¶ 50–53). From 20 to 30 yards away, they immediately drew weapons—handgun and rifle, aimed them at him, and took cover behind their vehicles. (J.A. 8, ¶ 53). Officer Hoover shouted conflicting commands—stop moving, show your hands, walk toward me, put your hands up, turn away. (J.A. 8, ¶ 55). Mr. Deweese remained still, explaining he had just been assaulted and done nothing wrong. (J.A. 8, ¶ 56). Hoover replied they would not listen until he walked toward them. (J.A. 8, ¶ 57). Faced with what looked like a firing squad, Mr. Deweese was too afraid to approach defendant officers and tried to call an attorney. (J.A. 8, ¶¶ 59–61).

He held up his phone, told defendant officers he was calling a lawyer,

4

and complied with requests to show he posed no threat. (J.A. 8, ¶¶ 61, 64–65). He slowly emptied a bag, revealing a book and a bottle. (J.A. 8, ¶¶ 62–65). He showed his hands empty and lifted his shirt, turning to show nothing in his waistband. (J.A. 8, ¶¶ 62–65). Appearing satisfied with those responses but unhappy with Deweese's attempts to talk instead of walk toward the officers, Defendant Hoover told Mr. Deweese they could wait there "all night." (J.A. 8, ¶ 67). Still, they kept their weapons trained on him as dispatch informed them that an officer with less-lethal tools was en route. (J.A. 8, ¶¶ 66, 72).

After officers requested backup, sheriff's deputies arrived. (J.A. 8, ¶ 68). Hoover told Deputy LeBaron to go to the tavern because they had the situation under control. LeBaron returned with a body-length ballistic shield. (J.A. 8, ¶¶ 70–71). Thirteen minutes into the encounter, K-9 Officer Hancock arrived. (J.A. 8, ¶ 73).

Hancock immediately shattered the fragile calm. He screamed at Mr. Deweese to walk out or be bitten while his dog barked loudly and pulled aggressively at its leash, making it difficult for anyone to hear. (J.A. 8, ¶¶ 74, 81–82).

The four officers grew impatient. (J.A. 8, ¶ 89). After just 20 minutes, they devised a plan: attack Mr. Deweese with the canine while he stood idle

30 yards away. (J.A. 8, ¶¶ 75, 79). They agreed to release the dog to bite and distract him while rushing in with "overwhelming force," with firearms ready pointed. (J.A. 8, ¶¶ 90–92). Hancock yelled a final warning: walk out or the dog will be sent to bite. (J.A. 8, ¶¶ 83–84).

This intensified Mr. Deweese's fear. He yelled back that if the dog attacked, he would shoot it in self-defense (J.A. 8, ¶ 87). Defendant officers ignored this warning and made no attempt to use their available less-lethal options, such as the ballistic shield or 40mm launcher. (J.A. 8, ¶¶ 93–97).

When they planned the canine attack, officers knew Mr. Deweese had been non-threatening for 20 minutes, had not threatened them, and was contained in the courtyard. (J.A. 8, ¶¶ 98–99, 101, 102). They never warned him they would use deadly force. (J.A. 8, ¶ 106).

Hancock released the dog with the order to "attack," and officers rushed in behind it. (J.A. 8, ¶ 107). As the dog closed in, Mr. Deweese stepped back around a corner railing and positioned his body perpendicular to defendant officers. (J.A. 8, ¶¶ 108–110). Only after the dog pursued, rounding the corner with Deweese and lunging to bite him, did he draw a handgun from his pocket, aiming it low away from officers and toward the attacking dog, exactly as he had warned. (J.A. 8, ¶ 111).

The instant they saw the gun aimed at the dog—not at them—officers

opened fire. (J.A. 8, ¶¶ 120–123). LeBaron emptied his 18-round magazine. (J.A. 8, ¶¶ 120–122). Hoover, Schuelke, and Hancock joined in, firing dozens of rounds even as the dog bit Mr. Deweese. (J.A. 8, ¶¶ 111–12, 123). They hit him 22 times. (J.A. 8, ¶ 123). Wilford Deweese died at the scene. (J.A. 8, ¶ 125). Mr. Deweese never pointed his gun toward officers. (J.A. 8, ¶ 119).

The district court's order did not acknowledge all these facts, but it confirmed that video of the incident did not contradict the Complaint's allegations. (J.A. 136 & n.1). This Court should therefore rely on the complete facts as alleged here and in the Complaint. (J.A. 8). *Teetz v. Stepien*, -- F.4th --, 2025 WL 1728527, at *9 (10th Cir. June 23, 2025).

The district court dismissed all federal claims, skipping first-prong constitutional analysis and holding that no precedent clearly established the force was excessive. (J.A. 143–46). It then dismissed the conspiracy and failure-to-intervene claims as a byproduct. (J.A. 146). The Estate seeks review and reinstatement of all federal claims.

## <u>SUMMARY OF THE ARGUMENT</u>

The district court granted qualified immunity by committing two fundamental errors: viewing facts in the light most favorable to defendant officers and misapplying excessive force law. The court conflated distinct standards for intermediate and deadly force and ignored controlling precedent. When viewed correctly, defendant officers' conduct violated clearly established law at three distinct points.

First, the canine attack was unconstitutional. Deploying such severe force against a non-threatening, contained person like Mr. Deweese was unnecessary and excessive.

Second, the deadly force was unconstitutional. Defendant officers shot Mr. Deweese not because he threatened them, but because he lawfully defended himself from the attacking canine—exactly as he had warned. Pointing a gun at an attacking animal is not a threat to human life that justified a 40-shot fusillade.

Third, even if officers perceived a threat, they recklessly created it. They needlessly escalated a stable situation by launching an unprovoked

canine attack with "overwhelming force," which foreseeably caused the very defensive reaction they later used to justify the shooting. [2]

The force used was clearly established as excessive by reference to direct Tenth Circuit law, the prevailing weight of authority in and out of the circuit, and obvious clarity considering existing principles and analogous circumstances.

The district court's qualified immunity determination was erroneous and should be reversed.

_____

[2] Courts have used various terms referring to the legal theory that an officer is liable for "creation of the need to use excessive force," including "danger creation," "incitement," "reckless escalation," "reckless precipitation," etc. To avoid confusion with the 14th amendment theory of "danger-creation," and for ease of reference, Appellant-Plaintiff uses the term "reckless incitement."

## <u>STANDARD OF REVIEW</u>

Qualified immunity is a question of law subject to *de novo* review on

appeal. *Cortez v. McCauley,* 478 F.3d 1108, 1115 (10th Cir. 2007).

## ARGUMENT

### I.     The District Court Interpreted Key Facts in a Light Most Favorable to the Defense, Which Infected Its Analysis.

A fundamental principle of review for motions to dismiss requires district courts to interpret complaint facts *and all inferences drawn therefrom* in the light most favorable to the plaintiff. *See, e.g. Mundt v. Gadziala,* No. 24-1041, 2024 WL 5087212, at *1, 6 (10th Cir. 2024) (reversing immunity grant and admonishing district court for improperly crediting defense-friendly factual assertions inconsistent with complaint allegations). The district court acknowledged this principle in its recitation of standards (J.A. 139) but failed to apply it. Instead, the court interpreted key facts in a light most favorable to defendant officers and even speculated that facts not included in the Complaint favored officers. Such interpretations were erroneous and materially infected the qualified immunity analysis.

1. <u>The District Court Wrongly Concluded that Deweese Shot First.</u>

In describing facts and distinguishing applicable precedent from the qualified immunity analysis, the district court concluded that Deweese fired his weapon at the canine and *then* officers fired in response. *See* J.A. 4, 12. However, the Complaint makes clear that the order of operations was reversed—the police fired first when they saw Deweese point a firearm at the

canine, before he fired. *See* J.A 8–9, 28, 29. This matters because a threat against an animal, particularly for self-defense, differs from menacing a human. *See* Section III(1)(a), *infra*. The Complaint was written precisely to correct similar misunderstandings. *See* J.A. 8–9, ¶¶ 2–3. This illustrates how the district court failed to view the facts favorably to Plaintiff and made inferences against plaintiff in contradiction of the complaint allegations. This was erroneous and led the court to suggest the defendant officers responded to more dire circumstances. *See* J.A. 146. But this was not an active shooter situation, and no facts suggest delaying the canine deployment would have resulted in grave danger. *See id.* (comparing *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600 (2015) and *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)). Deweese pointed his firearm at the dog only because police sent it to attack him; he only fired moments later— after officers began firing—because the dog was lunging at and biting him.

2. <u>The District Court Improperly Speculated About Nonexistent Dangers.</u>

The district court justified the shooting by speculating about two threats that are unsupported by the Complaint's allegations.

First, the court wrongly inferred a threat to officers. It speculated that after Mr. Deweese drew his gun, "it would only take a fraction of a second for him to turn toward the officers and start shooting at them too." (J.A. 146).

This inference disregards the entire 20-minute encounter history, during which Mr. Deweese showed no hostility. *See Barnes v. Felix*, 145 S. Ct. 1353, 1360 (2025). He complied with requests to empty his bag, showed his empty waistband, held up his hands, and tried to call a lawyer for guidance. His final action was consistent with this non-threatening pattern: he aimed the gun away from officers and toward the attacking dog, exactly as he had warned. No complaint allegations support the court's leap from this defensive act to an imminent threat against officers.

Second, the court wrongly inferred a threat to the public. It imagined a risk to onlookers from an "errant bullet." (Order at 11). But the Complaint references no onlookers near Deweese, and scene photographs corroborate that there were none close. (J.A. 16, 17, 19, 27). Furthermore, Deweese aimed down and away from officers, toward the dog, while a wall provided a backstop. (J.A. 26–27). At the motion-to-dismiss stage, a court's duty is to credit allegations and inferences favoring Plaintiff, not to invent hypothetical dangers for defendant officers' benefit.

3. <u>The District Court Improperly Inferred a Lack of Impairment to Distinguish Controlling Precedent.</u>

The district court used the Complaint's allegation that Mr. Deweese had consumed one eight-ounce beer to infer he was unimpaired, which it used to distinguish this Court's precedent in *Allen v. Muskogee*, 119 F.3d 837,

837 (10th Cir. 1997). *See* J.A. 144–45. This defense-friendly inference was error. Beyond consuming at least one beer, the Complaint alleges Deweese came from a bar area where he had been for some time. (J.A. 12, ¶¶ 27–42). Furthermore, officers found it strange that Deweese failed to walk toward police when demanded. If alcohol impairment is truly a key factor, these facts support a reasonable inference favoring Plaintiff, not against him, that he may have been intoxicated or otherwise impaired. Especially where a victim cannot testify due to the officers' use of deadly force, courts must be "cautious about making adverse inferences against them" and must instead "consider circumstantial evidence that could convince a factfinder that the officer acted unreasonably." *Pauly*, 874 F.3d at 1217–18. By finding Mr. Deweese was not impaired, the court again inverted the standard of review to defendant officers' benefit.

Relying on such interpretive errors to dismiss circuit authority from comparison in the qualified immunity analysis cannot be condoned. J.A. 145. This methodology highlights the likelihood of mistake when a court attempts to distinguish rather than summarize the field of pertinent authority for comparison of what gives officers "fair notice" under clearly established law. J.A. 141–46.

4. Broad Deference to Hasty Judgments is Inappropriate Where Officers Create Their Own Urgency.

14

The extraordinary deference ordinarily afforded to officers who are forced to make "split-second decisions" should not apply when officers needlessly create their own exigency. The situation here was not "tense and rapidly evolving" until officers made it so. To the contrary, the encounter was so stable that one officer admitted they had the situation "under control," and could wait "all night." (J.A. 20). When officers have time to de-escalate, their decision to escalate instead is not a split-second judgment entitled to deference. *See Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008). An officer cannot justify force that was precipitated by his own unreasonable conduct, particularly where he "did not need to make any split-second decisions." *St. George v. City of Lakewood*, No. 20-1259, 2021 WL 3700918, at *8 (10th Cir. Aug. 20, 2021) (unpublished).

## II. The District Court Conflated and Confused the Qualified Immunity Analysis Between the Constitutional Violations at Issue.

The district court identified two separate excessive force theories: one premised on canine force and one on subsequent deadly force. However, the court did not analyze or compare the applicable body of law commensurate with each type of force used. The court conflated the law applicable for each violation, confused the standards for each theory, and misapplied this Court's precedent.

1. <u>The District Court Failed to Analyze the Canine Attack Under the Correct Body of Law.</u>

The district court purported to analyze defendant officers' canine force separate from their deadly force but failed to apply any canine or intermediate force precedent to the circumstances. J.A. 141–45. Instead, it wrongly compared officers' use of canine force against precedent governing only deadly force. (J.A. 144–45) (citing *Allen*, 119 F.3d at 839, and *Est. of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019)). This failure is particularly glaring because the court itself identified the canine deployment as the dispositive issue:

> the key question is whether the Defendants are entitled to qualified immunity with respect to the use of the canine. That is because the latter claim depends on the former: if it was clearly established that it was unreasonable or reckless for Defendants to release a canine to subdue Mr. Deweese under the circumstances of this case, then they were not entitled to use lethal force in response to a danger they themselves unreasonably created.

*Id.* If the court had compared apples to apples regarding precedent applicable to each level of force at the time it was used, it could not so easily have overlooked the clear and egregious unconstitutionality of the canine deployment. *See Section* III, *infra*. Subsequent acts cannot retroactively justify force used beforehand. *Bella v. Chamberlain*, 24 F.3d 1251, 1256 (10th Cir. 1994). There is not even an arguable justification for the canine at the time of the deployment.

16

2. <u>The District Court Failed to Consider the Reckless Incitement Doctrine to Evaluate the Use of Deadly Force.</u>

The district court failed to apply the reckless incitement doctrine to the deadly force claim, which is the exact claim it is meant to address. J.A. 146. A reckless incitement analysis is triggered by *deadly force* to determine if an officer's own reckless conduct was "so immediately connected to [a suspect] arming [himself] that such conduct should be included in the reasonableness inquiry." *Pauly v. White*, 874 F.3d 1197, 1221 (10th Cir. 2017). By divorcing the doctrine from the shooting and considering it only in the canine deployment context, the court erroneously eliminated it from fair comparison and reached the flawed conclusion that it was plainly reasonable for officers to shoot a man who "pulled out a gun and started shooting." (J.A. 146). This ignores that otherwise-justified deadly force can be rendered unconstitutional if it was precipitated by officers' own reckless actions. *See Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1319 (10th Cir. 2009); *Pauly*, 874 F.3d at 1221. *Pauly* directly refutes the court's conclusion in multiple ways. 874 F.3d at 1220–21.

As this Court has done previously, it should evaluate: (1) the canine (intermediate) force at deployment, (2) deadly force at the time shots were fired, and (3) reckless incitement (for an additional or alternative means of

finding unreasonable conduct concerning the deadly force). *Thomson,* 584 F.3d at 1317; *Compare* Section III.

3. <u>The District Court Erred by Requiring a Predicate "Clearly Established Violation" for the Reckless Incitement Claim.</u>

In its limited analysis of Plaintiff's reckless incitement claim, the district court required a predicate act that is itself a "clearly established constitutional violation." (J.A. 141). This is the wrong standard. This Court's precedent requires only that an officer's precipitating conduct be objectively reckless—consciously disregarding a known or obvious risk. *See Flores*, 101 F.4th at 1195. The proper inquiry is whether an officer's "reckless conduct prior to the use of force . . . provokes a suspect's actions," *Rosales v. Bradshaw,* 72 F.4th 1145, 1153 (10th Cir. 2023) (citing *Pauly*, 874 F.3d at 1219–20), including "any immediately connected actions by the officers that escalated a non-lethal situation to a lethal one." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 771 (10th Cir. 2021). By demanding a separate, clearly established violation as the predicate instead of "reckless" behavior, the court improperly granted officers a second layer of qualified immunity on a single claim. This was error.

## III.    Defendant Officers' Use of Force Was Objectively and Egregiously Unreasonable.

While the Supreme Court has deferred discretion to inferior courts to decide which of the two prongs of the qualified immunity analysis to address

first (*Pearson v. Callahan,* 555 U.S. 223, 236 (2009)), the Tenth Circuit has also instructed that "an officer's violation of the *Graham* reasonableness test is a violation of clearly established law if there are no substantial grounds for a reasonable officer to conclude that there was reasonable justification." *Casey v. City of Federal Heights,* 509 F.3d 1278, 1286 (10th Cir. 2007). This rule did not die with *Pearson*; it has been carried through this Circuit's precedent for almost two decades, up through this Court's canine-specific determinations. *See Vette v. K-9 Deputy Sanders,* 989 F.3d 1154, 1170, 1172 (10th Cir. 2021) (recited precedent "prohibits force without legitimate justification, as when a subject poses no threat or has been subdued."); *Luethje v. Kyle,* 131 F.4th 1179, 1200 (10th Cir. 2025) (citing *Casey*; *Cavanaugh v. Woods*, 625 F.3d 661 (10th Cir. 2010); *Buck v. City of Albuquerque,* 549 F.3d 1269 (10th Cir. 2008); and *Vette* in support that "an officer's violation of the *Graham* reasonableness test is a violation of clearly established law if there are no substantial grounds for a reasonable officer to conclude that there was legitimate justification"). Thus, while a second-prong qualified immunity analysis may ultimately be determinative in some cases, a district court should not gloss over a first-prong analysis when the *Graham* factors weigh so heavily in plaintiff's favor that they show justification is completely lacking. That is the case here.

Determining whether the force used is constitutional requires evaluation of whether it was "reasonably necessary" under the circumstances. *Cortez,* 478 F.3d at 1126. This inquiry requires careful attention to the facts and circumstances at the time of each use of force, including the (a) severity of the crime at issue, (b) whether the suspect poses an immediate threat to the safety of officers or others, and (c) whether he is actively resisting arrest or attempting to evade arrest by flight. *Est. of Ceballos,* 919 F.3d at 1204 (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)).

In failing to examine the facts through this lens, the court overlooked clear and egregious violations of Plaintiff's Fourth Amendment rights. Plaintiff addresses each of his three theories below.

1. <u>Defendant Officers Used Excessive Force When They Deployed a Police Canine to Attack an Idle, Non-Threatening Subject.</u>

   a. <u>Graham *analysis re: canine—severity of the crime at issue.*</u>

The first *Graham* factor examines the severity of the crime reasonably suspected, based on objective evidence facing officers. *Lundstromo v. Romero,* 616 F.3d 1108, 1126–27 (10th Cir. 2010).[3]

---

[3] There is some disagreement regarding whether the first *Graham* factor requires deference to officers' *subjective* assertions about the type and level of crime at issue, as compared to crimes reasonably suspected. *See Morris v. Noe,* 672 F.3d 1185, 1195, fn. 4 (10th Cir. 2012). But precedent is clear

When officers deployed the canine, they suspected at most a misdemeanor or no crime at all. *See Est. of Taylor*, 16 F.4th at 763–64 (officer receiving report "that an unidentified male 'flashed' a gun,'" could not justify significant force, as the activity "could have been a misdemeanor or a felony – or it could have been no crime at all"); *see also Myers v. Brewer,* 773 Fed. App'x 1032, 1037 (10th Cir. 2019) (911 call about a subject outside a bar with a shotgun insufficient to believe a crime was committed, despite sheriff's belief that it was threatening). Like these precedents, the 911 call regarding Deweese reported a firearm display without harm. Additional complaint facts suggest self-defense even more clearly. *See* J.A. 14.

The Second Amendment protected Mr. Deweese's right to carry *and use* firearms for self-defense. *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 8, 32–33 (2022). The Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Id.* at 26. (citing *District of Columbia v. Heller,* 554 U.S. 570, 635 (2008)). The right to personal self-defense necessarily includes the right to use such arms "for all the ordinary

---

that "reasonableness" is an *objective standard.* Thus, *Lundstrom* is more correct in imposing an articulable suspicion standard for crimes reasonably suspected based on objective facts known by officers. *See id.*

purposes, in all ordinary modes usual in this country, and to which arms are adapted..." *Heller,* 554 S. Ct. at 614. Colorado law similarly permits defensive firearm use.  C.R.S. § 18-1-704. Thus, police officers in this state cannot reasonably claim that the possession, display, or use of a firearm for self-defense can be surprising or inherently dangerous. It is not a crime to defend oneself.

Correspondingly, Deweese's later statement to officers that he would defend himself by shooting the police canine *if sent to attack* did not provide alternative or more serious crimes. The statement was not a "serious expression of an intent to commit an act of unlawful violence." *United States v. Dillard,* 795 F.3d 1191, 1199 (10th Cir. 2015). Deweese was only warning he would defend himself, if necessary, consistent with his right to self-defense. C.R.S. § 18-1-704; C.R.S. § 18-9-202(II)(2.5)(b); *see also People v. Fuller*, 781 P.2d 647, 650 (Colo. 1989) ("self-defense is permissible when unreasonable or excessive force accompanies either lawful or unlawful arrests."); *Surat v. Klamser,* 52 F.4th 1261, 1273, 1275–76 (10th Cir. 2022) (self-defense appropriate where disproportionate force used to overcome "minimal" resistance).

Finally, a threat to damage property (the canine) for self-defense cannot be reasonably interpreted to include a threat against human life.

*See* C.R.S. § 18-3-206 (menacing requires threatening another "person."). Canines are not treated the same as human beings under our laws. *See Sentell v. New Orleans & C.R. Co.,* 166 U.S. 698 (1897) (by the common law, and law of most states, dogs are recognized as property); *see also American Canine Foundation v. City of Aurora, Colo.,* 618 F. Supp. 2d 1271, 1277 (D. Colo. 2009) ("[i]n Colorado, dogs are accorded qualified property status") (citing *Thiele v. City & County of Denver,* 312 P.2d 786 (Colo. 1957)). The law does not view dogs as having any rights other than as property. *Id.* at 1278. As such, "needlessly killing a dog" is a class 1 misdemeanor under Colorado law. C.R.S. § 18-9-202. Most pertinently, it is no crime at all "to use physical force upon a law enforcement animal to defend their own person when the person reasonably believes that a law enforcement animal is an application of unreasonable or excessive force." C.R.S. § 18-9-202(II)(2.5)(b).

Even if the Court sees this factor differently, the overwhelming weight of the remaining two factors make the constitutional violation clear. *See Vette,* 989 F.3d at 1170, 1172 (finding the second and third *Graham* factors "weigh so strongly against significant force that [the officer] cannot prevail").

> b. Graham *analysis re: canine—the "immediate threat" factor weighs decisively against the use of force.*

23

The excessive force inquiry evaluates the force used against what is "reasonably necessary" to effect a lawful detention under the circumstances. *Cortez,* 478 F.3d at 1126. The "immediate threat" inquiry is the "most important" *Graham* factor, focusing on the danger posed "at the precise moment that [officers] used force." *Id.*; *Vette*, 989 F.3d at 1170.

At that moment, Mr. Deweese was doing nothing threatening. For twenty minutes, he remained stationary and calm. This preceding context confirmed his innocuous state, as he had already shown officers his empty hands and waistband and was trying to call a lawyer. (J.A. 20, 62–67). *See Barnes*, 145 S. Ct. at 1354 (while circumstances "at the precise time of the shooting will often matter most... prior events may show why a reasonable officer would perceive otherwise ambiguous conduct as... innocuous."). An officer cannot ignore specific, developing facts that contradict the need for force. *Cavanaugh*, 625 F.3d at 666.

The Officers' only potential basis for perceiving a threat was Mr. Deweese's statement that he would shoot the dog if it attacked. But this was a conditional statement of lawful self-defense against an animal, not a threat of "unlawful violence" against officers. *See Dillard*, 795 F.3d at 1199. Under Colorado law, it is not a crime to use physical force against a law enforcement animal when a person reasonably believes it is an application of excessive

24

force. C.R.S. § 18-9-202(2.5)(b). His intent was clear: to neutralize a non-human tool that threatened him with serious injury, not to engage in a shootout with officers. *See Sentell*, 166 U.S. at 702 (a ferocious dog is "*hostis humani generis*"). Because Mr. Deweese posed no immediate threat to any person, this critical factor weighs decisively in his favor. *See Bella*, 24 F.3d at 1256; *Emmett v. Armstrong*, 973 F.3d 1127, 1136 (10th Cir. 2020).

> c. Graham *analysis re: canine—Deweese did not flee or actively resist arrest.*

The third *Graham* factor evaluates whether a suspect was fleeing or actively resisting arrest when force was used. 490 U.S. at 396; *see Emmett*, 973 F.3d at 1136. The mere possibility that a suspect might in the future flee or resist does not weigh in favor of an officer's use of force. *Herrera v. Bernalillo Cnty. Bd. of Cnty. Comm'rs*, 361 F. App'x 924, 928 (10th Cir. 2010).

Most importantly, this and other circuits have repeatedly distinguished "active resistance"—which may justify force—from passive non-compliance, which does not. *See Ibarra v. Lee,* 135 F.4th 1257 (10th Cir. 2025) *(*no active resistance where a jury could reasonably find only "minimal defensive actions"); *Jordan v. Jenkins,* 73 F.4th 1162, 1174 (10th Cir. 2023) (no active resistance where suspect "did not pull away… or use his arm to push back…"); *Emmet,* 973 F.3d at 1136 (no active resistance, despite "not

readily complying with [officer's] order"); *Myers,* 773 F. App'x at 1037 (no active resistance, despite failing to immediately comply with commands to put his hands up or get on the ground); *Aldaba v. Pickens,* 777 F.3d 1148, 1158–59 (10th Cir. 2015) (resistance was nothing more than "passive"); *Bridges v. Yeager*, 352 F. App'x 255, 259 (10th Cir. 2009) ("subject merely non-compliant"); *Nosewicz v. Janosko*, 754 F. App'x 725, 733 (10th Cir. 2018) (discussing and distinguishing the failure to follow commands from active resistance); *see also Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012); *Young v. Cnty. Of Los Angeles*, 655 F.3d 1156 1165 (9th Cir. 2011); *Landon v. City of North Port*, 745 F. App'x 130, 136 (11th Cir. 2018) (suspect was incapable of resisting due to position).

Mr. Deweese's failure to walk toward officers pointing guns at him falls squarely into mere non-compliance, not active resistance. He remained stationary and surrounded. He never physically resisted or refused to be arrested; rather, he followed commands to show he posed no threat. Officers never told him he was under arrest, because they lacked reliable or trustworthy information amounting to probable cause. In his idle position, Deweese's conduct is antithetical to the concept of active resistance to arrest. There was no need to rush force where officers had no exigency and no need to make split-second decisions. *Compare* J.A. 23–25; *with Chew*

*v. Gates,* 27 F.3d 1432, 1443 (9th Cir. 1994).

With no threat and no exigency, the officers' duty was to maintain the status quo during their investigative detention, not to shatter it with unprovoked force. *See Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000) (an investigative detention permits officers to briefly detain a suspect to "maintain the status quo" while obtaining more information); *United States v. Hensley*, 469 U.S. 221, 235 (1985) (same); *Cortez,* 478 F.3d at 1130–31 (officers restraining a person using a telephone may only use force necessary to secure their safety and "maintain the status quo"). Defendant officers were simply impatient. By choosing to launch a canine attack on a non-threatening person, they used severe force when none was justified.

### d. *The district court assumed "active resistance" meant something different than decades of precedent reflect.*

The district court, in a footnote based on the untethered general statement that "resistance need not be physical," appears to have determined that Plaintiff "actively resisted arrest" by "refusing" to follow officers' commands to walk toward them. J.A. 143, fn. 4. This conclusion is wrong for three reasons.

First, *Anderson v. DelCore* is materially distinguishable. 79 F.4th 1153, 1165 (10th Cir. 2023). That case involved a suspect who physically yanked away a cell phone containing evidence that could easily be

destroyed and affirmatively refused to acquiesce to officers' attempts to seize the property amid exigent circumstances. *Id.* at 1160. Mr. Deweese's conduct was inapposite: he was stationary, complied with multiple commands, and never affirmatively obstructed officers from seizing evidence. The situation involved no exigency, and Deweese's choice to talk instead of walking toward firearms pointed at him was likely a natural reaction to fear or failure to understand, not an act of resolute defiance. *See United States v. Romero,* 935 F.3d 1124, 1130 (10th Cir. 2019) (evasive speech is not a refusal implicating resistance to arrest unless combined with "resolute noncompliance"). Furthermore, the corresponding force employed in *DelCore* was a "relatively small" grabbing and twisting of the person's arm, proportional and consistent with force necessary to take a person into custody, as compared to the disproportionate force used to attack Deweese. *DelCore*, 79 F.4th at 1165.

Second, mere non-compliance is not active resistance. *See* Section III(1)(c), *supra*. Even if *DelCore*'s generalized declaration that "resistance need not be physical" is interpreted to apply, it is not descriptive enough to identify a completely new paradigm of non-physical resistance. A single panel decision cannot overrule this Court's extensive precedent identifying active resistance as meaningfully different from mere failure to comply.

*See Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1292 (10th Cir. 2024). *DelCore*'s quoted statement can be interpreted to be consistent with *Romero's* requirement that any non-physical resistance requires "resolute refusal." But *DelCore* cannot mean that anything not in compliance with officers' orders constitutes "active resistance." Mr. Deweese did not physically impede or resolutely refuse any officer's reasonable attempt to physically take him into custody. He was not even told he was under arrest.

Third, officers' demand that Deweese advance toward them, 30 yards away, likely exceeded their authority. An officer cannot use force to compel obedience to an unlawful command. *See Story v. Taylor*, 696 F.3d 987, 992 (10th Cir. 2012). During temporary detentions, an officer's authority is limited to maintaining the status quo; it does not include compelling a suspect to move more than a short distance. *See Kolender v. Lawson*, 461 U.S. 352, 365 (1983) (Brennan, J., concurring); *see also United States v. Sharpe*, 470 U.S. 675, 692 n.2 (1985) (Marshall, J., concurring) (same). "Police officers do not have absolute authority to order citizens to adjust behavior on a whim." *Blackmore v. Carlson*, No. 2:21-CV-00329, 2024 WL 2883010, at *16 (D. Utah June 7, 2024). The command for Mr. Deweese to abandon his position of safety and advance 30 yards toward threatening firearms exceeded that authority. "The balance struck by the Fourth

29

Amendment between public interest in effective law enforcement and the equally public interest in safeguarding individual freedom and privacy from arbitrary governmental interference forbids such expansion." *Kolender*, 461 U.S. at 365–66. Staying put is not reasonably interpreted as active resistance. *See Casey*, 509 F.3d at 1282 (by remaining stationary, the suspect "made himself easier to capture, not harder."); *Cavanaugh*, 625 F.3d at 665 (no resisting where subject was not told she was under arrest and did not prevent officer from walking over and placing her under arrest).

2. Defendant Officers Used Excessive Deadly Force When They Shot Mr. Deweese Over 40 Times Because He Pointed a Firearm at a Canine in Self-Defense.

    *a.* Graham *analysis re: shooting—severity of the crime at issue.*

When officers shot Mr. Deweese, he was defending himself from the canine attack exactly as he had warned. He pointed his weapon at the dog, not at officers. This cannot reasonably be construed as criminal in light of the law regarding canines as property, the law concerning self-defense, and the predictability of Deweese's action given his advance warning. *See* Section III(1)(a), *supra*.

    *b.* Graham *analysis re: shooting—Deweese presented no imminent threat to human life.*

Officers' use of deadly force was unconstitutional because Mr.

Deweese posed no imminent threat to human life. It has been clearly established for decades that deadly force may not be used to protect property. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). A police canine is property. *See supra*. Therefore, a threat directed solely at a police dog cannot justify deadly force. C.R.S. § 18-9-202; *cf.* C.R.S. § 18-3-206; *see also* C.R.S. § 18-9-202(II)(2.5)(b); *Fuller*, 781 P.2d at 650.

Unlike cases where deadly force is justified, Mr. Deweese made no hostile motions *toward the officers. Cf. Est. of Valverde v. Dodge*, 967 F.3d 1049, 1064 (10th Cir. 2020) (deadly force justified where suspect made hostile motions toward officers during "high-risk" drug bust). To the contrary, virtually every fact demonstrated that his actions were defensive and directed only at the attacking dog. Officers knew he had been non-threatening for twenty minutes; they heard him warn he would defend himself *from the dog*; and they saw him aim the gun low and away from them, toward the animal. A reasonable officer would have known his "manifest intentions were to protect himself… not to cause harm." *Rosales*, 72 F.4th at 1153; *St. George*, 2021 WL 3700918, at *7; *see also* Section I(2), *supra*.

This was not a fast-moving situation requiring split-second decision-making, so such rhetoric is inapplicable to these circumstances and does

not entitle defendant officers to blind deference. Deadly force could not be justified by a threat against the animal. Deadly force was not a justified response to Deweese defending himself from serious bodily injury. Deadly force was not justified by the totality of the circumstances. A reasonable jury could conclude that the officers unreasonably perceived an immediate threat, or that the officers used unreasonable force when they shot Deweese for defending himself from an unreasonably deployed and imminent dog mauling.

> i.  *All four Larsen factors show that Mr. Deweese posed no immediate threat.*

Defendant officers will undoubtedly argue that Deweese frightened them by pulling out a firearm. But "serious physical harm… does not mean [] any risk of physical harm to others, no matter how slight." *Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009) (cleaned up). Instead, in deadly force cases involving armed subjects, courts consider the degree of threat facing officers using the *Larsen* factors: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Est. of Larsen,* 511 F.3d at 1260. Each factor weighs decisively in the Estate's favor.

First, officers did not order Plaintiff to drop his weapon. *See Est. of Harmon v. Salt Lake City,* 134 F.4th 1119, 1123 (10th Cir. 2025). Nor did officers provide a warning before using deadly force. *Id.* at 1123. The feasibility of providing a warning is not in doubt; after Mr. Deweese announced his intent to defend himself from the dog, the defendant officers had ample time to warn him that doing so would be met with deadly force. *See Pauly*, 874 F.3d at 1216 (five seconds was sufficient time to issue a warning). Officers chose to deploy the canine anyway, compelling a veritable Sophie's Choice, while failing to alert Deweese that if he did what he thought would protect him, defendant officers would kill him. This sequence demonstrates it was feasible *and important* to alert Deweese to officers' thinking.

Second, Deweese made no hostile motions with his weapon toward officers. There is a "fundamental distinction between mere possession of a weapon and hostile movements made with it." *Rosales*, 72 F.4th at 1153; *see also St. George,* 2021 WL 3700918, at *7; *see also Est. of Taylor*, 16 F.4th at 763–64*; Myers,* 773 F. App'x 1032. Like in *Rosales* and *St. George*, Mr. Deweese lawfully possessed a weapon for his defense and did not point it at any officer. He kept it out of view and out of reasonable consideration during the 20-minute interaction. After the dog release, Deweese

positioned his body away from officers before drawing the weapon defensively; he did not draw on the dog until absolutely required—at the last possible second before being bitten, and he aimed the gun low and away from defendant officers, toward only the attacking dog. Thus, his actions were purely defensive, not hostile toward any person. Officers had extensive information that Mr. Deweese's possession and even handling of the gun was for self-defense, not to threaten harm to any person. *Compare Rosales* at 1153.

Third, at least 20-30 yards separated defendant officers from Deweese, and officers had the additional benefit of police vehicle cover. *See* J.A. 23. This is similar to officers in *Pauly* who were separated by 50 feet and a rock wall. *Pauly,* 874 F.3d at 1218. To the extent defendant officers shortened that distance and abandoned cover, such facts fuel the reckless incitement theory.

Fourth, Deweese's "manifest intentions" were to preserve the status quo, protect himself, and not cause harm. Deweese stated so in advance, behaved consistently with that intent, and demonstrated no hostility toward any officer or other person. Like in *Rosales and St. George*, Deweese remained calm during the entire interaction, while the officers' conduct was the very reason Deweese armed himself for self-defense. 72

F.4th at 1153–54. Thus, officers lacked justification to shoot Deweese. If a suspect "posed no threat … and … a reasonable officer would have recognized as much," this fact would be "dispositive of a Fourth Amendment violation… because deadly force is constitutional only if a reasonable officer would have had probable cause to believe that there was a threat of serious physical harm to themselves or others." *Est. of Harmon,* 134 F.4th at 1128 (citing *Clerkley v. Holocomb,* 121 F.4th 1359, 1365 (10th Cir. 2024)).

c. Graham *analysis re: shooting—Plaintiff did not flee or actively resist arrest when shot.*

As established above, Mr. Deweese was not fleeing or actively resisting before the canine attack, and his actions after the attack began were also not an attempt to resist arrest—they were a predictable attempt to defend himself from a dog mauling. He took only a few steps back from the encroaching dog while remaining in officers' full view. Such minimal, defensive movement is not active resistance. *See Morris v. Noe*, 672 F.3d 1185, 1197 (10th Cir. 2012) (no active resistance where suspect took a few steps back). By remaining largely stationary, Mr. Deweese "made himself easier to capture, not harder." *Casey*, 509 F.3d at 1282.

The appearance of his firearm was not a sudden act of defiance; it was the predictable result of the officers' decision to attack him. Despite officers

leaving Deweese no alternative to avoid serious bodily injury at the time of deployment, he did not try to run away. He did not obstruct a reasonable attempt to detain him to maintain the status quo, nor any attempt to place him in handcuffs.

3. <u>Defendant Officers Are Liable for Recklessly Creating the Need for Deadly Force by Inciting Deweese to Defend Himself.</u>

Even if the shooting were reasonable in the moment it occurred, officers are liable because their own reckless conduct created the need for deadly force. *See City of Tahlequah v. Bond*, 595 U.S. 9, 11 (2021) ("Tenth Circuit precedent allows an officer to be held liable for a shooting that is itself objectively reasonable if the officer's reckless or deliberate conduct created a situation requiring deadly force."). Officers acted recklessly in deploying the canine and rushing in with firearms in an "overwhelming" display of force, against a contained, non-threatening person who had clearly announced he was armed and would defend himself from the dog. This was precisely the type of "immediately connected action[] . . . that escalated a non-lethal situation to a lethal one." *Est. of Taylor*, 16 F.4th at 771; *see also Flores*, 101 F.4th at 1194.

The officers' recklessness was compounded by their failure to warn. Knowing their unprovoked attack would cause Mr. Deweese to draw his firearm, it was critical for them to provide a deadly-force warning. They had

ample time to do so after Deweese notified them he would defend himself from a frightening dog, and the failure was itself unreasonable. *See Pauly*, 874 F.3d at 1216; *Cordova*, 816 F.3d at 660.

This Court's decision in *Thomson* is not to the contrary. There, a canine was reasonably used to locate an agitated suspect who had threatened his wife and was fleeing, armed, through a neighborhood. 584 F.3d at 1317, 1320. Here, the facts are opposite: Mr. Deweese was stationary, contained, and non-threatening. The canine was used not to locate, but to attack. *Thomson* supports the principle that a canine deployment must be justified and provides notice to officers that courts in this circuit will analyze the reasonableness of a canine deployment for reckless incitement when circumstances warrant. The *Thomson* court acknowledged that deploying a canine can potentially inflict "serious bodily harm" or even "death." *Id.* at 1315. It is plain that heightened levels of force require proportional justification. A reasonable jury could conclude defendant officers lacked *reasonable* justification.

## IV. Defendant Officers' Conduct Violated Clearly Established Law.

The law was sufficiently clear to give every reasonable officer notice that the conduct here was unconstitutional. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood

that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, Tenth Circuit, or the weight of authority from other courts. *Gann v. Cline,* 519 F.3d 1090, 1092 (10th Cir. 2008).

This standard does not require a "scavenger hunt for a prior case with identical facts." *Shepherd v. Robbins*, 55 F.4th 810, 815 (10th Cir. 2022). Instead, precedent must simply involve "materially similar conduct" that provides officers with fair notice. *Luethje*, 131 F.4th at 1198 (citing *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017)). When searching for materially similar conduct, courts should look for analogous facts pertaining to the "violative nature" of the officer-conduct alleged to have violated a plaintiff's rights. *King v. Hill,* 615 F. App'x 470, 477 (10th Cir. 2015). Key facts recognized in prior precedent that either analogously demonstrate a constitutional violation or identify pertinent facts more egregious than those at bar, demonstrate "*a fortiori*" that an officer had fair notice his actions would violate a suspect's Fourth Amendment rights. *Est. of Ceballos,* 919 F.3d at 1216; *see also McCowan v. Morales,* 945 F.3d 1276, 1286 (10th Cir. 2019) (precedent holding an officer liable based on most of the same "salient

facts" or a lesser subset, "*a fortiori*, advises an officer of the illegality of his behavior").

While it is true that courts should not define clearly established law at a high level of generality, "defining a right too narrowly risks making recovery against a public official virtually impossible…" *Mayfield v. Bethards,* 826 F.3d 1252, 1258 (10th Cir. 2016). "Because excessive force jurisprudence requires an all-things-considered inquiry with 'careful attention to the facts and circumstances of each particular case,' there will almost never be a previously published opinion involving exactly the same circumstances." *Casey,* 509 F.3d at 1284. Courts should not rely on factual distinctions that are so minor or immaterial that they lose sight of key constitutional guides. *See Reavis Est. of Coale v. Frost,* 967 F.3d 978, 994–95 (10th Cir. 2020) (rebutting dissent's call for greater factual similarity in comparing precedent on excessive force claim); *Simpson v. Little,* 16 F.4th 1353, 1366 (10th Cir. 2021) (dismissing "minor factual differences" where precedent established that officers may not use lethal force against a driver who does not pose an immediate threat). Courts should also not distinguish away relevant analogous precedent based on factual "red herrings" *See Clerkley,* 121 F.4th at 1366 (rejecting defendant's "red herring" distinctions because the uniting characteristics of the pertinent precedent established a

clear prohibition). Courts must recognize analogous conduct in prior precedent that would provide officers "fair notice" not to take the kinds of actions that would violate a person's rights *Id.* at 1366–67 (clearly established law recognized by "heavily analogizing" to cases that inform the historical state of the law). Qualified immunity is defeated when officers "fail to make 'reasonable applications of the prevailing law to their own circumstances.'" *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).

1. <u>Canine Force was Clearly Prohibited by Direct, On-Point, Tenth Circuit Authority, and by the Prevailing Weight of Authority from Other Courts In and Out of this Circuit.</u>

   a. <u>*On-point Tenth Circuit precedent established that attacking a non-threatening suspect is unconstitutional.*</u>

This Court's discussion in *Luethje* identifies how and why the canine attack here was unconstitutional. There, this Court held that by February 2022 (two months before the events here), the law was clear: "using a police canine to bite and restrain a non-violent, non-resisting suspect was unconstitutional." 131 F.4th at 1199. The Court based this holding on "extensive case law" forbidding the use of intermediate force—whether by Taser, tackle, pepper-spray, projectiles, or canine—against individuals who, like Mr. Deweese, pose no threat and were not resisting when force was used. *Id.* at 1200–01 (synthesizing cases including *McCoy v. Meyers,* 887 F.3d

1034, 1047 (10th Cir. 2018), *Morris,* 672 F.3d at 1197, *Casey,* 509 F.3d at 1285, *Cavanaugh,* 625 F.3d at 666, and *Buck,* 549 F.3d at 1291).

Furthermore, *Vette* clearly established that regardless of the specific force tool used, "the Fourth Amendment prohibits force without legitimate justification, *as when a subject poses no threat* **or** has been subdued." *Vette,* 989 F.3d at 1170 (collecting cases) (emphasis added). There can be no doubt that the use of disproportionate force constitutes excessive force. *Perea v. Baca,* 817 F.3d 1198, 1204 (10th Cir. 2016).

The district court ignored this entire body of law. (J.A. 141–45). Instead, it cited a footnote questioning whether Tenth Circuit decisions clearly establish law at all. (J.A. 143, n.3). This was error. Officers had clear notice that using severe force, such as a canine, to attack a stationary, non-threatening, subject violated the Fourth Amendment.

### b. *The prevailing weight of other district courts within circuit.*

Beyond binding precedent, a strong consensus of district courts within this Circuit had already provided clear notice that officers' conduct was unconstitutional. The district court dismissed this authority as non-binding. J.A. 142. But while individual district court opinions are not controlling, a robust consensus of courts applying this Circuit's precedent is highly persuasive on fair notice, particularly as each case applied this Court's non-

canine force precedents to canine situations. These courts, faithfully applying the precursors to *Luethje*, consistently held that deploying a canine against a non-threatening, non-resisting suspect is unconstitutional. *See, e.g.*, *Cook v. City of Albuquerque*, 639 F. Supp. 3d 1185, 1202 (D.N.M. 2022); *Mullins v. City of Boulder*, 575 F. Supp. 3d 1360, 1369 (D. Colo. 2021); *Erickson v. City of Lakewood*, 489 F. Supp. 3d 1183, 1199–203 (D. Colo. 2020); *Brown v. Whitman*, 651 F. Supp. 2d 1216, 1227 (D. Colo. 2009); *Katterman v. Salt Lake Cnty.*, No. 2:13-CV-1122, 2017 WL 1207518, at \*6–8 (D. Utah Mar. 31, 2017); *Trujillo v. City of Albuquerque*, No. CIV 08-0531, 2009 WL 3260724, at \*4 (D.N.M. Sept. 11, 2009).

A consensus of six out-of-circuit decisions can clearly establish law. *Irizarry v. Yehia*, 38 F.4th 1282, 1294 (10th Cir. 2022). It follows that numerous in-circuit district courts reaching the same conclusion can also provide fair notice. It is the applicability of legal norms that are important to the analysis, not technicalities. *Est. of Booker v. Gomez,* 745 F.3d 405, 428–29 (10th Cir. 2014).

> c. <u>*Prevailing weight of other circuit court decisions.*</u>

Finally, a robust consensus of other circuits reinforces the conclusion that the officers' conduct was unconstitutional. Numerous courts of appeals agree that deploying a canine to bite a suspect who is cornered, constrained,

or is otherwise not threatening or actively resisting violates the Fourth Amendment. *See, e.g.*, *Cooper v. Brown*, 844 F.3d 517, 523 (5th Cir. 2016) (suspect was not threatening or resisting); *Campbell v. City of Springboro*, 700 F.3d 779, 789 (6th Cir. 2012) (suspects were not threatening or actively fleeing); *Priester v. City of Riviera Beach*, 208 F.3d 919, 927–28 (11th Cir. 2000) (suspect was lying down and posed no threat); *Chew*, 27 F.3d at 1443 (suspect could not move or present a threat); *Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) (suspect posed no immediate threat and did not actively resist); *Landon,* 745 F.Appx. at 136  (suspect incapable of resisting). This widespread agreement further demonstrates that the law was clearly established. *Irizarry*, 38 F.4th at 1294.

2. <u>Deadly Force was Fairly Prohibited by Clear Tenth Circuit Principles and Analogous Examples.</u>

a. *<u>The right not to be shot while posing no immediate threat was clearly established.</u>*

The bedrock principle of deadly force law is that officers may not shoot suspects absent probable cause of an immediate threat to human life. *Flores*, 101 F.4th at 1194. This rule was clearly established long before these events. *Ibarra*, 135 F.4th at 1264. Even when facing dangerous situations, it is clearly established that officers may not shoot non-threatening suspects.  *Finch v. Rapp,* 38 F.4th 1234, 1243 (10th Cir. 2022); *Pauly,* 874 F.3d at 1222 (deadly

force unreasonable where officer did not have probable cause to believe there was an immediate threat of serious harm to himself or another officer).

When assessing whether a suspect poses a threat of serious physical harm, the inquiry is on whether a suspect poses an immediate threat *toward human beings*, not property, and whether the threat was posed at the time the officers fired. *See, e.g. Thomson,* 584 F.3d at 1317–18 (police shooting was justified by gun pointed at officers, not by subject pointing gun at canine beforehand); *Reavis Est. of Coale at* 990 (10th Cir. 2020) (no justification for deadly force where a vehicle used as a weapon had begun to pass officer, and, despite the subject's reckless driving there was no immediate danger "to other officers or civilians").

Thus, the law clearly precluded officers from using deadly force without probable cause to believe he posed a threat to them.

### b. <u>The distinction between holding a weapon and making hostile threats toward officers with it was clearly established.</u>

This Court has long recognized a "fundamental distinction between mere possession of a weapon and hostile movements with it." *Est. of Harmon*, 134 F.4th at 1126. Deadly force is not justified against a person who holds a weapon and has not "taken hostile or provocative action toward the officers." *Tenorio v. Pitzer*, 802 F.3d 1160, 1164–66 (10th Cir. 2015); *Baca v. Cosper,* 128 F.4th 1319, 1326 (10th Cir. 2025) (no immediate threat where

suspect with knives in her hands, six feet away from an officer, "made no slicing or stabbing motions toward [officer]."). This distinction applies to suspects who possess firearms as well as those with other weapons. *See Rosales,* 72 F.4th at 1153 (suspect armed with a firearm but did not point it at officer); *St. George*, 2021 WL 3700918, at *7 (suspect carrying a shotgun in a low-ready position to protect himself); *see also Cooper v. Sheehan,* 753 F.3d 153, 159 (4th Cir. 2013) (no qualified immunity for officers who shot a man holding a shotgun pointed at the ground in absence of threats and facts indicating suspect might harm them).

Even when officers observe a firearm in a subject's hand, it does not automatically create an inference that a suspect poses *a threat to officers. See Pauly,* 874 F.3d at 1209 (despite a man pointing his gun in the direction of officers while the man's brother fired protective shots in the air, "a reasonable jury could find that [officer] was not in immediate fear for his safety or the safety of others given his cover, the distance from the window, and the darkness.").

Furthermore, when a reasonable jury could conclude an officer did not reasonably believe a suspect posed an immediate threat, this creates a factual dispute regarding the reasonableness of the threat, and qualified immunity should not be granted. *Finch,* 38 F.4th at 1241–42. "The law is clear" that an

officer's belief of an immediate threat must be reasonable, based on objective information facing officers and not based on faulty assumptions. *Pauly,* 874 F.3d at 1221.

Mr. Deweese never pointed his gun at officers; his actions were purely defensive. Because a reasonable jury could conclude his actions were not hostile toward officers when he was shot, qualified immunity is improper. *See Finch*, 38 F.4th at 1241–42; *Pauly*, 874 F.3d at 1221.

### c. <u>*The unconstitutionality of the shooting was obvious.*</u>

Finally, even without a factually identical case, this shooting was an obvious constitutional violation. Qualified immunity does not protect conduct where the violation is so "flagrantly unlawful that few dare its attempt." *Rosales*, 72 F.4th at 1156–57. As then-Judge Gorsuch wrote, "some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015). Shooting a man 22 times for lawfully defending himself from an unprovoked and unjustified animal attack, when a reasonable officer would understand he was not threatening officers, is one of those things. Defendant officers should not be afforded qualified

immunity protection. *Rosales,* 72 F.4th at 1148, 1156; *St. George*, 2021 WL 3700918, at \*7–8.

3. <u>The Law on Reckless Incitement was Clearly Established in Light of Tenth Circuit Principles and Analogous Tenth Circuit Authority.</u>

The Officers' conduct violated clearly established principles and analogous illustrations of reckless incitement. The law provides fair notice that officers are liable for a shooting, even if otherwise reasonable, if their own reckless conduct "unreasonably created the need to use such force." *Flores*, 101 F.4th at 1194; *see also Pauly*, 874 F.3d at 1217.

a. *<u>Tenth Circuit precedent clearly established that a "police onslaught" provoking a defensive reaction is unconstitutional.</u>*

This Court has repeatedly found reckless incitement where officers engage in a "police onslaught at the victim"—an aggressive, precipitous action that foreseeably provokes a defensive reaction. *See Arnold v. City of Olathe, Kan.*, 35 F.4th 778, 789 (10th Cir. 2022). The unprovoked canine attack on Mr. Deweese was precisely such an onslaught. This Court has found similar unconstitutional conduct in cases like *Allen*, 119 F.3d 837 (aggressively confronting an armed man), *Est. of Ceballos*, 919 F.3d at 1204 (rushing a man with a bat), *Bond v. City of Tahlequah*, 981 F.3d 808 (10th Cir. 2020), *rev'd on other grounds*, 142 S. Ct. 9 (2021) (aggressively cornering a man in his garage); and *Pauly,* 874 F.3d at 1215 (aggressively

threatening to intrude into suspect's home). In each case, officers escalated a non-lethal situation into a lethal one by their own unreasonable tactical choices—a dangerous approach that provoked a defensive response in the suspect. *See Est. of Taylor*, 16 F.4th at 771–72 (synthesizing cases).

Officers engaged in the kind of "onslaught" that reasonable officers would understand "with a high degree of knowledge" would likely result in a risk of harm. That risk was made inescapably glaring by Deweese's warning that he would use his firearm to defend himself from the canine. But even after officers received notice that Deweese would defend himself with a firearm not previously displayed, officers further increased that risk of harm by providing no deadly force warning and deciding to commence anyway. Such conduct was worse than that recognized as unconstitutional in *Allen*, *Ceballos*, *Bond*, and *Pauly*. Thus, these cases, were "sufficient, *a fortiori*, to put [the officers] on notice that [their] actions (as we must accept them here) violated [Deweese's] Fourth Amendment rights." *Ceballos,* 919 F.3d at 1216.

### b. <u>Tenth Circuit precedent clearly established that antagonizing an armed subject into acting aggressively is unconstitutional.</u>

District courts have also found violations based on a reckless incitement theory "where an officer is alleged to have 'aggressively approached [the suspect] or in some way threatened, provoked, or incited [him]...as *Anderson* and other cases establish." *Est. of Thakuri v. City of*

*Westminster*, 19-CV-02412-DDD-KAS, 2024 WL 1152565, at *7 (D. Colo. Mar. 14, 2024) (citing *Allen*, *Sevier v. City of Lawrence*, 60 F.ed 695 (10th Cir. 1995), *Est. of Ceballos,* and *Delcore*). This is because "heightening the atmosphere of tension and fear" can predictably lead a suspect to respond in a manner necessitating the use of deadly force. *See Est. of Taylor,* 16 F.4th at 774, 776 (citing and comparing *Bond*, 981 F.3d at 822–24).

Without surveying other reckless incitement cases, one might assume that the pertinent fear officers are on notice to avoid amplifying from *Allen* and *Ceballos* is that associated with mentally ill, upset, or intoxicated persons, who have diminished ability to reason. *See Bond*, 981 F.3d at 823. But mental impairment was not at issue in *Pauly, Rosales*, or *St. George*. In each case, the type and gravity of aggressive officer conduct was the very cause of suspects arming themselves for their protection. 874 F.4th at 1221; 72 F.4th at 1155; 2021 WL 3700918, at *8; *see also Bond,* 981 F.3d at 824. These cases show that severe aggression, regardless of a subject's mental abilities, can poke at a person's vulnerabilities, stoke fear, and incite armed but peaceful persons to respond uncharacteristically to protect themselves. Thus, regardless of the level of mental impairment or vulnerability Deweese exhibited, the heightened level of officer aggression (especially combined with the lack of justification) predictably incited Mr. Deweese to act in self-

defense in the same ways that show they clearly and obviously violated the Constitution.

But, unlike much of this Court's reckless incitement precedent, Mr. Deweese did not point a firearm or otherwise threaten officers who threatened to inflict serious bodily injury on him. Thus, the Defendant officers' conduct was less justified, and worse. "*[A] fortiori*" those case, too, "should have advised the officer[s] of the illegality of [their] behavior." *McCowan,* 945 F.3d at 1286.

     c. <u>*Tenth Circuit precedent clearly established that anticipating self-defensive responses must be performed to avoid unconstitutional reckless incitement.*</u>

Similar to Deweese's self-defense right, *Pauly* acknowledged that officers must consider a subject's constitutional right and actions of self-defense when they act, because "the inherent right of self-defense has been central to the Second Amendment." *Pauly*, 874 F.3d at 1219 (citing *Heller,* 554 U.S. at 628–29). It concluded, "it was no surprise" that the Pauly brothers armed themselves for their protection, because "it was their constitutional right to do so." *Id.* This contributed to how a reasonable officer should have viewed the subjects' "manifest intentions." *Id.* Similarly, officers' actions in aggressively threatening Deweese with the canine, which prompted Deweese to take self-defensive action, was reckless not only

because it was escalating and dangerous, but because it disregarded Deweese's Second Amendment right.

> ### d. *The district court's attempts to distinguish this precedent fail.*

The district court considered only *Allen* and *Ceballos* close enough to compare in its clearly established law analysis. J.A. 143–44.[4] It attempted to distinguish these cases on two grounds, but neither is persuasive.

First, it pointed to the long length of the 20-minute interaction preceding release of the canine. J.A. 145 (concluding that a 20-minute period before officers deployed was more like *Bond* than *Allen*, and too much to be similar to the 90-second period in *Allen*). However, the court misapprehended the "short period" pertinent to reckless incitement analysis. *Allen* and *Ceballos* queried whether officers' reckless actions leading to the subject's self-defensive response were close enough in time to assess whether their actions were "immediately connected" to the shooting to be included in

---

[4] The court dismissed *Bond* because the Supreme Court overruled it on second-prong qualified immunity grounds. J.A. 143. But it did not overrule the Circuit's constitutional conclusion. *See City of Tahlequah*, 595 U.S. at 12 ("[w]e need not, and do not, decide whether the officers violated the Fourth Amendment in the first place."). After reversal, this Court used the constitutional finding in *Bond* to elaborate on the contours of the same right at issue in *Taylor*. *See Est. of Taylor*, 16 F.4th at 758, fn. 4 ("we are comfortable relying throughout this opinion on those portions of our *Bond* decision that the *Bond II* court did not invalidate"). Thus, the circumstances recognized as unconstitutional in *Bond*—whether on its own or through *Taylor*—continue to provide fair notice. *Cf.* J.A. 144.

a reasonableness analysis. *See Ceballos,* 919 F.3d at 1216; *Arnold,* 35 F.4th at 790 ("one important factor… is the amount of time between an officer's actions and the use of force"). Thus, what matters is not whether an entire incident unfolded within a short period, but whether officers' reckless actions leading to a fatal confrontation happened within a period short enough that there was no attenuation or intervening event. The relevant timeframe is the seconds between officers' reckless act of deploying the canine and the shooting. *See Ceballos,* 919 F.3d at 1216; *Arnold,* 35 F.4th at 790.

Second, it noted suspects in *Allen* and *Ceballos* were mentally impaired. J.A. 145. However, *Ceballos,* acknowledged that reckless incitement theory requirements cannot be "so narrowly" cabined. *Est. of Ceballos*, 919 F.3d at 1217. Officers in *Ceballos* did not know the subject had a mental illness or disability, only reasons to anticipate the subject's diminished reasoning ability, "whatever the underlying reason might have been—mental health problems, emotional distress, drunkenness, or drugs." *Id.* The same is true with Deweese. When viewing facts most favorably to his Estate, he could be viewed as having signs of requisite impairment. *See* Section I(4), *supra*. Also, Deweese was too afraid to walk toward officers. To the extent officers thought his behavior was odd, they should have suspected

his ability to reason was likely diminished, "whatever the underlying reason" (emotional distress from the prior self-defense situation, mounting fear from a virtual firing-squad of officers, or intoxication). But even if they didn't, as described above, mental impairment is broader than signaled in *Allen* and not necessarily required for this doctrine. *Ceballos*, 919 F.3d at 1214; *see also Pauly*, 874 F.3d 1197; *Rosales*, 72 F.4th at 1145.

These clarifications make *Allen* and *Ceballos* comparable, not distinguishable.

## V.    The District Court Failed to Recognize or Apply Clear Legal Principles that Highlighted the "Obviousness" of the Constitutional Violations at Issue.

Beyond specific on-point cases clearly establishing law with similar or analogous facts, clear constitutional principles may also establish that an "obvious" or "egregious" violation occurred without further detail required. *See Fuqua v. Santa Fe County Sheriff's Office,* 2025 WL 1331667, *27–28 (D.N.M. 2025) (collecting cases and discussing both "obviousness" and "egregious" conduct in context of clearly established law). The Supreme Court has reminded us recently that "general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful." *Frasier v. Evans*, 992 F.3d 1003, 1015 (10th Cir.

2021) (quoting *Taylor v. Riojas*, 592 U.S. 7, 8, (2020) (per curiam)); *McCoy v. Alamu,* 141 S. Ct. 1364, 1364 (2021) (vacating and remanding in light of *Taylor v. Riojas*); *see also Turman v. Orem City,* 1 F.4th 1227, 1240 (10th Cir. 2021) (interpreting and applying *Taylor* to conclude that evidence fabrication is sufficiently obvious that no reasonable person would believe it was constitutional*); see also Pierce*, 359 F.3d at 1298 ("[t]he degree of specificity required... to clearly establish the violation... depends in part on the character of the challenged conduct... the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required."). Thus, a plaintiff need not identify "'a case directly on point,' as long as there is existing precedent that places the unconstitutionality of the conduct beyond debate." *McCowan*, 945 F.3d at 1285. "A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer,* 536 U.S. 730, 741 (2002). General statements of the law can clearly establish a right if they apply with "obvious clarity" to the specific conduct. *Halley v. Huckaby,* 902 F.3d 1136, 1149 (10th Cir. 2018) (citing *Hope,* 536 U.S.at 741). General statements provide the required notice to officers when the unlawfulness of their conduct is "apparent" from the pre-existing law. *White*,

580 U.S. at 80 (internal quotation marks omitted). Furthermore, "the unlawfulness of Defendants' conduct may "follow immediately from the conclusion that a general rule exists and is clearly established." *A.N. by and through Ponder v. Syling,* 928 F.3d 1191, 1198 (10th Cir. 2019).

Several clear constitutional rules that the district court failed to acknowledge demonstrate that officers' attacks were "obviously" unconstitutional.

1. The Legitimate Justification Rule Obviously Made Clear the Canine Attack Was Unconstitutional.

This Circuit has developed longstanding principles in its excessive force jurisprudence through repeated application of the *Graham* analysis. Chief among them is the legitimate justification rule: "the Fourth Amendment prohibits the use of force without legitimate justification, **as when a subject poses no threat** or has been subdued." *Vette,* 989 F.3d at 1170 (collecting cases) (emphasis added).[5] This rule has broad and substantial force, as it has been developed and relied upon repeatedly to recognize "clear" and "obvious" constitutional violations in novel circumstances without any "on-point" factual precedent. *See, e.g.,*

---

[5] *Vette* has, at times, been interpreted to apply more potently to post-restraint conduct. *See, e.g. Luethje,* 131 F.4th at 1198 (discussing pre-restraint vs. post-restraint cases). However, *Luethje* made clear that *Vette* was not so limited. *Id.* at 1200.

*McCowan,* 945 F.3d at 1286–87 ("clear" excessive force by subjecting arrestee to "rough ride" without seat-belt, because "post-restraint force was unconstitutional"); *McCoy v. Meyers,* 887 F.3d at 1052–53 (post-restraint strikes "obvious[ly]" excessive after pre-restraint force knocked subject unconscious); *Morris,* 672 F.3d at 1197–98 (pre-restraint tackling "clearly unjustified" where subject "posed no threat… nor did he resist or flee,"); *Buck,* 549 F.3d at 1291 (less-lethal projectiles excessive where subject "posed no threat and did not attempt to flee"); *Scherbarth v. Woods,* 2020 WL 1538755 *4–6 (D. Colo. May 31, 2020) (legitimate justification rule and *McCowan*, *Dixon, Weigel,* and *Casey* clearly establish as excessive pre-arrest takedown and post-arrest punch); *Cook v. City of Arvada,* 2021 WL 243451 at *7 (D. Colo. Jan. 25, 2021) (legitimate justification rule and *McCoy v. Meyers*, *Dixon*, *Casey*, *Weigel*, *Morris*, and *Cavanaugh* clearly establish as excessive pushing and Tasering while subject was non-resistant). Thus, the legitimate justification rule repeatedly echoed by this Court gives officers ***fair warning*** that (a) they must have *legitimate justification* consistent with *Graham* to use force at all times, and (b) timeframes during which a subject *does not pose a threat* cannot be used to provide justification.

However, the district court completely failed to consider this principle, the cases cited in support, or its application anywhere in its order. *See* J.A.

134–47. The court failed to consider or apply any legal principles that could have made it obvious that defendant officers' conduct in deploying the canine would have been unconstitutional. *Id.* Instead, it looked only for matching facts in two singularly identified cases it considered close enough to compare, while distinguishing them on narrow grounds, and disregarding all others. J.A. 142–46.

This analytical mode leaves much to be desired when comparing precedents that survey the landscape of pertinent cases to evaluate the requisite "fair notice" required to overcome qualified immunity. Precedent clearly establishing the law need not come from a single case with exactly the same facts because that almost never happens. This Court routinely looks to multiple cases, in total, to clearly establish the law pertinent to specific circumstances, and analogizes based on that combined precedent. *See, e.g.* *Vette,* 989 F.3d at 1172; *Clerkley,* 121 F.4th at 1366. This Court also routinely synthesizes multiple specific incidents of misconduct found in multiple violations into clearly applicable rules to put officers on notice of conduct that would, derivatively, be violative. *See Luethje,* 131 F.4th at 1200. The legitimate justification rule applies with "obvious clarity."

2. <u>Disturbingly Disproportionate Force is Obviously Unconstitutional.</u>

Since at least 2016, it has been clearly established that using "disproportionate" force to arrest an individual who has not committed a

serious crime and who poses no threat to others constitutes excessive force. *Davis v. Clifford,* 825 F.3d 1131, 1137 (10th Cir. 2016); *see also Perea, 817 F.3d* at 1203–04 (disproportionate force is clearly established as unconstitutional, even when officers are justified in using some force to overcome resistance). When officers use a "disturbing" degree of force in circumstances that do not justify aggressive action, a prior case with similar facts is not needed. *Davis,* 825 F.3d at 1136; *cf. Surat,* 52 F.4th at 1279 (while an officer's conduct in throwing a subject to the ground was constitutionally disproportionate, it was not so "disturbing" in degree that it would have been "obvious").

As described in Section III, the amount of force "reasonably necessary" to effectuate a detention (or arrest) was not significant. Yet, officers deployed a "severe" amount of force, which disproportionately threatened "serious bodily harm."

Excessive force analysis must account for the risk of serious injury inherent to the use of police canines. *See Winston v. Lee*, 470 U.S. 753, 761 (1985) ("A crucial factor in analyzing the magnitude of the [Fourth Amendment seizure] is the extent to which the procedure may threaten the safety or health of the individual."). Using an off-leash canine trained to bite is more significant than other uses of force in two regards: (1) the lack

of control and (2) the potential for serious injury. *See, e.g.*, *Watkins v. City of Oakland*, 145 F.3d 1087, 1091 (9th Cir. 1998) ("Police dogs were trained to and tested to bite solidly, bite hard, and hold on… to re-bite if needed[,] and to bite whatever part of the person's body is nearest to them."). Although this Court has declined to deem canine force deadly force, it has acknowledged that canines can inflict "serious bodily harm" or even "death." *See Thomson,* 584 F.3d at 1315; *see also Vera Cruz v. City of Escondido,* 139 F.3d 659, 661–62 (9th Cir. 1997) (police dogs can—and often do—cause serious harm, including biting faces, biting off noses, and biting people's genitals); *Robinette v. Barnes,* 854 F.2d 909, 912 (6th Cir. 1988) (canine caused death by biting subject's throat); *Chew,* 27 F.3d at 1441 ("severe" canine force used to drag a subject ten feet and nearly severed subject's arm); *Miller v. Clark,* 340 F.3d 959, 961–63 (9th Cir. 2003) ("a canine bites with up to 1200 psi of pressure… it is capable of lacerating arteries that can cause death… even if it avoids a suspect's head or neck…"). A canine is not merely a means of apprehension/detention, like handcuffs. It is a significant use of force that screams for "legitimate" and "substantial" justification. *Vette,* 989 F.3d at 1170. The canine attack here not only lacked commensurate justification, it was disturbingly disproportionate and foreseeably incited Mr. Deweese to defend himself.

*Rosales* put it best: "it should be obvious to any reasonable officer that he or she cannot commit aggravated assault... unjustified force does not fall into the hazy border between excessive and acceptable force." 72 F.4th at 1158. Similarly, the force used by officers through their attack dog constituted aggravated assault without justification and was "obviously" excessive.

3. Deadly Force Without Probable Cause of an Immediate Threat to Human Life is Obviously Unconstitutional.

As described in Section III(2) above, the use of deadly force requires officers to have information amounting to probable cause that a subject is presenting an immediate threat of serious physical harm to humans when they fire. *Pauly,* 874 F.3d at 1222. "This, alone, is dispositive of a Fourth Amendment violation in this context, because deadly force is constitutional only when accompanied by the requisite probable cause." *Clerkley,* 121 F.4th at 1365.

The district court failed to recite, acknowledge, or apply this critical constitutional principle. The probable cause rule is precisely the kind of clear articulation from which notice of the unlawfulness of conduct "follow[s] immediately from the conclusion that a general rule exists and is clearly established." *A.N.,* 928 F.3d at 1198. This is especially true in light of the

additional clarifications concerning the contours of the right offered by the cases cited above.

4. <u>Deadly Force Without a Warning (where feasible) Obviously Violates the Constitution.</u>

The Supreme Court has made clear that "'some warning' must be given before an officer uses deadly force, if feasible." *Samuel v. City of Broken Arrow,* 506 F. App'x 751, 754 (10th Cir. 2012) (citing *Garner,* 471 U.S. at 12); *see also Cordova,* 816 F.3d at 660 (same). This Court has been extremely flexible with the requirement, loosening it when officers order subjects to "drop a weapon" when events are unfolding extremely quickly. *See Palacious v. Fortuna,* 61 F.4th 1248, 1259 (10th Cir. 2023). But the Defendant officers did not even provide that to Mr. Deweese. A warning is a "critical component of risk assessment and de-escalation." *Cole v. Carson,* 935 F.3d 444, 453 (5th Cir. 2019). It is not always known that officers subjectively perceive certain acts to be threatening to a point of no return without articulating it. *Deorle v. Rutherford,* 272 1272, 1284 (9th Cir. 2001). "It is not objectively reasonable [to shoot] when the officer neither orders the individual to stop nor to drop [a weapon], and does not even warn him that he will be shot if he fails to halt." *Id.* A warning could have made a tremendous difference here.

WHEREFORE, Appellant-Plaintiff requests reversal of the qualified immunity decision and reinstatement of the excessive force, conspiracy, and failure to intervene claims.

## **STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff-Appellant Estate of Wilford Deweese respectfully requests oral argument in this matter.

Dated: July 31, 2025.

Respectfully submitted,

Civil Rights Litigation Group

By: /s *Raymond K. Bryant*

Raymond K. Bryant
for Plaintiff-Appellant
Estate of Wilford Deweese

1543 Champa St. Ste. 400
Denver, CO 80202
raymond@rightslitigation.com
(720) 515-6165

## <u>CERTIFICATE OF COMPLIANCE</u>

*Certificate of Compliance With Type-Volume Limit,*
*Typeface Requirements, and Type Style Requirements*

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,975 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as indicated by Microsoft Word's word-count function.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Georgia.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

Dated: July 31, 2025.

By:   *s/ Raymond K. Bryant*
Raymond K. Bryant
for Plaintiff-Appellant
Estate of Wilford Deweese
Civil Rights Litigation Group,
1543 Champa St. Ste. 400
Denver, CO 80202
raymond@rightslitigation.com
(720) 515-6165

## <u>CERTIFICATES OF DIGITAL SUBMISSION</u>

(1) I hereby certify that a copy of the foregoing **OPENING BRIEF OF APPELLANT**, as submitted in Digital Form via the Court's ECF system, is an exact copy of the written document filed with the Clerk.

(2) I further certify that it has been scanned for viruses with the AVG Antivirus software and, according to the program, is free of viruses.

(3) In addition, I certify all required privacy redactions have been made.

Dated: July 31, 2025

By:  */s Raymond Bryant*
Raymond K. Bryant
for Plaintiff-Appellant
Estate of Wilford Deweese
Civil Rights Litigation Group
1543 Champa St. Ste. 400
Denver, CO 80202
raymond@rightslitigation.com
(720) 515-6165

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing **OPENING BRIEF OF APPELLANT** was furnished through (ECF), and is expected to provide electronic service to the following on this 31st day of July, 2025.

Eric M. Ziporin
Jonathan Eddy
SGR, LLC
3900 E. Mexico Ave., # 700
Denver, Colorado 80210
P: 303-320-0509
Email: eziporin@sgrllc.com
Email: jeddy@sgrllc.com
Attorneys for Defendants Hoover and Schulke

And

Bryan E. Schmid
Steven W. Martyn
Christopher Strider
El Paso County Attorney's Office
200 S. Cascade Avenue
Colorado Springs, CO 80903
P: (719) 520-6485
F: (719) 520-6487
Email: bryanschmid@elpasoco.com
Email: stevenmartyn@elpasoco.com
Email: chrisstrider@elpasoco.com
Attorneys for Defendants Hancock and Lebaron

By:    */s Raymond Bryant*
_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Daniel D. Domenico

Civil Action No. 1:24-cv-00960-DDD-NRN

ESTATE OF WILFORD DEWEESE,

     Plaintiff,

v.

RONNIE HANCOCK,
DANIEL LEBARON,
LEVI HOOVER, and
JEFFREY SCHUELKE,

     Defendants.

---

### ORDER GRANTING MOTIONS TO DISMISS

---

    This case arises out of the fatal shooting of Wilford Deweese by police officers in the mountainside town of Manitou Springs, Colorado. Mr. Deweese's estate claims this shooting—and the preceding use of a canine to try to secure his arrest—violated his Fourth Amendment right to be free from the use of excessive force. Defendants have moved to dismiss Plaintiff's complaint. Because Plaintiff has failed to show that their actions violated clearly established law, Defendants' motions must be granted and Plaintiff's claims dismissed.

- 1 -

## BACKGROUND[1]

As alleged in the complaint, Mr. Deweese was a 67-year-old man from Florida who was returning from a cross-country trip between Florida and California when the events in question occurred. Dkt. 1 at ¶¶17; 19. "On the way back from California, Mr. Deweese stopped in Manitou Springs, Colorado and stayed in an AirBnB rental." *Id.* at ¶ 20.

On the evening of April 11, 2022, Mr. Deweese went out to a bar in Manitou Springs called the Royal Tavern, where he "ordered a single 8 oz beer and attempted to play pool." *Id.* at ¶¶ 23–27. His estate claims he "appeared very out of place to locals," who viewed him as "upper-crusty" and "well-to-do" based on his "grey hair," "blue and white plaid shirt, blue vest, white/khaki slacks, and a fisherman's hat." *Id.* at ¶¶25–26. At some point during his time at the bar, the bartender "took offense" to a comment he had made and "decided not to serve Mr. Deweese any longer." *Id.* at ¶¶ 28–32. "Mr. Deweese paid his tab and left peacefully." *Id.* at ¶ 33.

"Mr Deweese then went to another bar blocks away, called the Keg." *Id.* at ¶ 34. "The bartender at the Keg took one look at Mr. Deweese and decided from his appearance that she did not want him in the bar. She shook her head when he attempted to open the door three separate times and gestured for him to leave." *Id.* at ¶ 36. "Mr. Deweese began walking down the main strip on Manitou Ave. and realized he had left some of

---

[1] The parties disagree about the propriety of considering the bodycam and witness footage attached to Dkt. 26 at this stage of litigation. Dkt. 38 at 3–6; Dkt. 42 at 2–3. Though the outcome here would not be changed were I to disregard the footage altogether, I have reviewed it and determined that it does not conflict with any of the allegations in the complaint. To the extent that Defendants offer their own version of facts ostensibly based on this footage, I have not considered this in reaching this decision. *See* Dkt. 26 at 2–5.

his belongings in the Royal Tavern." *Id.* at ¶ 39. "Mr. Deweese returned to the Royal Tavern to get his things." *Id.* at ¶ 40.

"When Mr. Deweese walked in, he was confronted by the bartender who told him she was not going to serve him and that he had to leave." *Id.* at ¶ 41. "An argument erupted between the two and the bartender attempted to push him out of the establishment." *Id.* at ¶ 42. A local patron then "approached Mr. Deweese from behind and pushed him, knocking Mr. Deweese to the ground." *Id.* at ¶ 43. "Mr. Deweese stood up and attempted to pull a gun from out of his pocket to show that he could defend himself from what appeared to be an overwhelming crowd of hostiles." *Id.* at ¶ 44. "At the first sight of the weapon, the bartender yelled 'he's got a gun, call 911.'" *Id.* at ¶ 46. "Someone called 911 and police were dispatched." *Id.* at ¶ 49.

After he left the Royal Tavern for the second time, "Mr. Deweese walked several blocks down Manitou Avenue, toward a local art installation and courtyard in the center of town around 900 Manitou Ave." *Id.* at ¶ 50. "It was at this courtyard. . . that police officers found Mr. Deweese." *Id.* at ¶ 52.

"When they arrived, Manitou Springs police officers Defendants Hoover and Schuelke pulled their police vehicles over and parked on the street in front of Mr. Deweese, and immediately pulled out their firearms—one handgun and one rifle—and pointed them at Mr. Deweese." *Id.* at ¶ 53. The police officers yelled out a number of commands to try and secure Mr. Deweese's arrest, including "turn away" and "walk toward me," but Mr. Deweese did not move. *Id.* at ¶¶ 55–59. "Mr. Deweese continued to stand idle for nearly 20 minutes[.]" *Id.* at ¶ 64.

At some point during this standoff, Officer LeBaron "joined Officers Hoover and Schuelke and brought along his body-length shield." *Id.* at ¶ 71. And "[a]pproximately 13 minutes after officers Hoover and

Schuelke made contact with Mr. Deweese, Defendant officer Hancock arrived with his K-9 Jinx." *Id.* at ¶ 73. Officer Hancock "yelled out that if Mr. Deweese did not walk out with his hands up, he would send the dog in to bite him." *Id.* at ¶ 83. "After the officers yelled that he would be bitten if he did not walk out, [Mr. Deweese] yelled clearly that he would defend himself if forced to by shooting the dog if it was sent to attack him." *Id.* at ¶ 87.

After about twenty minutes of waiting, and seven minutes after the canine arrived on the scene, "the Defendant officers, together, decided to end the situation with force and send in the dog to attack, while they 'rushed' in behind the canine with only firearms ready." *Id.* at ¶ 90. As the canine charged around a corner, Mr. Deweese "pulled a small handgun from his pocket," aimed "toward the attacking dog, and fired it." *Id.* at ¶ 111. The officer Defendants then opened fire on Mr. Deweese, hitting him 22 times. *Id.* at ¶ 123. Mr. Deweese died on the scene. *Id.* at ¶ 125.

On April 9, 2024, Mr. Deweese's estate filed suit in this case, alleging that the Defendant officers violated the Fourth Amendment's prohibition against excessive force when they released a canine on Mr. Deweese and then shot him to death after he opened fire on the canine. *Id.* at ¶¶ 126–142. The estate also alleged that the Defendant officers unconstitutionally failed to intervene to stop the dog from being used to attack Mr. Deweese and that the Defendants' actions violated the Colorado constitution. *Id.* Defendants moved to dismiss on August 9, 2024. Dkt 24; 26.

## LEGAL STANDARD

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) requires a court to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."

*Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). In doing so, the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). A court will "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id.* At this stage, the well-pleaded facts underlying a plaintiff's allegations must articulate a viable legal claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555.

## DISCUSSION

It is no doubt a tragedy that what began as an evening out in a picturesque tourist town wound up with both a police canine and a human being shot dead. And it may be true, as Plaintiff suggests, that both would still be alive had the defendants named here employed "other reasonable non-force options"—such as "engaging in a real back and forth dialogue, answering questions to gain trust and ensure security, insulating themselves with available body armor, using ballistic shields on scene to slowly gain safe distance," "approaching from behind in stealth," or "simply and straight-forwardly" approaching him in a "non-threatening manner"—before they released the canine and the fatal

shootout ensued. Dkt. 38 at 14. But whether, with the benefit of hind-sight from the relative "peace of a judge's chambers," there were other, possibly better, options is not the inquiry here. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). The question before me is not whether the police could or should have taken other measures in some general sense, but whether the measures they did take were so clearly constitutionally impermissi-ble that no reasonable officer could have concluded otherwise. *See id.*; *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, (2015) ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it.") (quotation marks omitted). The facts alleged do not support that conclusion, so De-fendants' motions must be granted and Plaintiff's claims must be dis-missed.

## I.     Qualified Immunity

In order to overcome a defense of qualified immunity, a plaintiff must establish both "that the defendant's conduct violated a federal constitu-tional or statutory right" and "that the right was clearly established at the time of the conduct." *Hulen v. Yates*, 322 F.3d 1229, 1237 (10th Cir. 2003). Judges are "permitted to exercise their sound discretion in decid-ing which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here the second prong is dispositive.

Plaintiff has alleged two separate claims[2]—one premised on the use of the canine and one on the subsequent use of deadly force—but the key question is whether the Defendants are entitled to qualified immunity with respect to the use of the canine. That is because the latter claim depends on the former: if it was clearly established that it was unreasonable or reckless for Defendants to release a canine to subdue Mr. Deweese under the circumstances of this case, then they were not entitled to use lethal force in response to a danger they themselves unreasonably created. That is because police may not "recklessly cause the need to use deadly force." *Estate of Alire v. Wilhera*, No. 23-1213, 2024 WL 5183300, at *4 (10th Cir. Dec. 20, 2024).

On the other hand, if it was *not* clearly established that Defendants acted unconstitutionally by releasing the canine, then there is no doubt that they were entitled to use lethal force once Mr. Deweese drew his gun and started firing. *See, e.g.*, *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) ("a reasonable officer need not await the glint of steel before taking self-protective action.") (cleaned up). Likewise, Defendants can have had no duty to intervene to stop the canine if it was not clearly established that its use was unconstitutional. The outcome of this case thus hinges on whether the Defendants are entitled to qualified immunity with respect to their use of the canine.

## A. Use of police canine

Whether a law is clearly established for the purposes of qualified immunity depends on whether a "reasonable official in the defendant's

---

[2]    While the complaint states two claims, they each are brought under a variety of federal and state sources, including 42 U.S.C. § 1983, Fourth Amendment, and C.R.S. §13-21-131, Colo. Const. Art. II. *See* Dkt. 1 at 22–23. My analysis below is limited to the federal claims; as noted below, the state claims will be dismissed without prejudice to refile in state court. *See* 28 U.S.C. § 1367(c)(3).

circumstances would understand that her conduct violated the plaintiff's constitutional right." *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006). Though "a general constitutional rule identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), the Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality." *City of Escondido v. Emmons*, 586 U.S. 38, 503 (2019) (cleaned up).  And the Tenth Circuit has clarified both that the "dispositive question is whether the violative nature of *particular* conduct is clearly established," *Aldada v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (emphasis in original; quotation marks omitted), and that "existing precedent must have placed the statutory or constitutional question beyond debate." *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015) (quotation marks omitted). The Circuit has also emphasized that "[i]t is particularly important that a Fourth Amendment right be clearly established in a specific factual scenario because it can be difficult for an officer to determine how the prohibition against excessive force will apply in novel situations." *Arnold v. City of Olathe*, 35 F.4th 778, 793 (10th Cir. 2022).

I note initially that a number of the cases Plaintiff cites do not satisfy the criteria necessary to qualify as clearly established law. For example, Plaintiff cites six district court cases for the proposition that it "is clearly established in the Tenth Circuit that a police officer may not use significant force on a non-violent, non-resistant suspect who is accused of only minor, non-violent crimes." Dkt. 37 at 13–15. Even if this statement of the established law is not the sort of highly general proposition that the Court has emphasized cannot serve as the basis for holding officers liable, Plaintiff's lower court cases are inapplicable to this analysis. *See T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) ("A plaintiff may

show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation.");[3] *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("[D]istrict court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity.").[4]

Plaintiff also claims that *Bond v. City of Tahlequah*, 981 F.3d 808 (10th Cir. 2020), clearly establishes that Defendants' conduct was unreasonable here despite the fact that this case was reversed by the Supreme Court. 595 U.S. 9. Even if in theory a decision reversed by the Supreme Court could clearly establish the law, it does not here because on remand the Tenth Circuit vacated its earlier judgment and instructed

---

[3]   The Supreme Court has in fact called into question whether even circuit court decisions can constitute clearly established law. *See, e.g.*, *City of Escondido*, 586 U.S. at 43 (2019) ("Assuming without deciding that a court of appeals decision may constitute clearly established law for purposes of qualified immunity. . ."); *Kisela v. Hughes*, 584 U.S. 100, 106 (2018) (per curiam) ("[E]ven if a controlling circuit precedent could constitute clearly established law in these circumstances, it does not do so here.") (citation omitted); *Pina v. Estate of Jacob Dominguez*, 604 U.S ____, ____ (Mem.) (2025) ("Even if it is assumed that controlling Circuit precedent may constitute clearly established law. . .") (Alito, J., dissenting in denial of certiorari).

[4]   Plaintiff has also not shown how this general statement of the law would apply here, where the decedent was actively resisting law enforcement commands for about twenty minutes. *See, e.g.*, *Anderson v. DelCore*, 79 F.4th 1153, 1165 (10th Cir. 2023) (holding that "resistance need not be physical" and clarifying that active resistance includes "when an individual refuses to obey an officer's lawful orders"); *see also Helvie v. Jenkins*, 66 F.4th 1227, 1238 (10th Cir. 2023) (holding that officers' commands "would be hollow" unless "they can use reasonable force to execute those orders"); *Cf. Luethje v. Kyle*, No. 24-1257, 2025 WL 851085, at *7 (10th Cir. Mar. 19, 2025) (finding caselaw prohibiting warrantless entries applied with "obvious clarity" to releasing a canine into a house based solely on information that "a suspect had broken a window and then run away").

the district court to grant the officer defendants' motions. *Bond v. City of Tahlequah*, No. 19-7056, 2022 WL 227098, at *1 (10th Cir. 2022); *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 634 n.6 (1979) ("Of necessity our decision vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect.") (cleaned up).

That leaves Plaintiff with two cases that could potentially establish the clear illegality of Defendants' actions here—*Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997), and *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019). Plaintiff claims these cases stand for the proposition that "the reckless manner in which [Defendants] approached [Deweese] and [their] precipitous resort to lethal force violated clearly established Fourth Amendment law," Dkt. 38 at 17 (quoting *Estate of Ceballos*, 919 F.3d at 1220), and therefore establish that Defendants were in clear violation of the Constitution when they released the canine on Mr. Deweese. That is not so.

As it happens, *Allen* is one of the cases that the Supreme Court considered when it determined that there was no violation of clearly established law in *City of Tahlequah*. It noted there that while "the officers in *Allen* responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hands," the officers in *City of Tahlequah* "by contrast, engaged in a conversation with [the decedent], followed him into a garage at a distance of 6 to 10 feet, and did not yell until after he picked up a hammer." *City of Tahlequah*, 595 U.S. at 13. This case is more like the latter than like *Allen*. As in *City of Tahlequah*, the record is clear that the officers attempted to speak with Mr. Deweese for some twenty minutes before they ever deployed any force. In *Allen*, by contrast, "[t]he entire sequence, from the time [Defendant] arrived to the time [decedent] was killed, lasted approximately ninety seconds." 119 F.3d at 839. Further,

while *Allen* involved a suicidal suspect whose known mental illness required a modified response from law enforcement, there is nothing in the complaint to indicate that Mr. Deweese was mentally ill or obviously intoxicated. *Cf.* Dkt. 1 at ¶ 27 ("At the Royal Tavern, Mr. Deweese ordered a single 8 oz beer.").

*Estate of Ceballos*, like *Allen*, involved a suspect whose "capacity to reason was diminished, whatever the underlying reason might have been—mental health problems, emotional distress, drunkenness, or drugs." 919 F.3d at 1217. Also like in *Allen*, the defendant police officers in *Estate of Ceballos* "shot and killed [the] emotionally distraught [decedent] within a minute of arriving on scene." *Id.* at 1216. Neither of those factual features is present here. The fact that Ceballos was "in his own driveway" at the time of the shooting and "posed harm to no one" also meaningfully distinguishes that case from this one, where Mr. Deweese was in public, in a central part of town near at least some bystanders, and had already brandished his gun at the Royal Tavern, resulting in the bartender calling 911. Dkt. 1 at ¶¶ 44–46. Under the totality of these circumstances, it was not unreasonable for the Defendants to fear that Mr. Deweese—and the possibility that an errant bullet fired from his gun might hit an onlooker—posed a significant risk to public safety. *See, e.g., Graham*, 490 U.S. at 396 ("Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.") (quotation marks omitted).

The burden on a plaintiff to overcome the doctrine of qualified immunity is a heavy one, and it can, at times, appear unjust. But it is the law that must be applied, and in light of the totality of the circumstances here, Plaintiff has failed to carry its burden to show that *Allen* and

*Estate of Ceballos* clearly established that the Defendants in this case acted in violation of the Constitution when they released the canine towards Mr. Deweese. *See City of Tahlequah*, 595 U.S. at 14 ("Suffice it to say, a reasonable officer could miss the connection [those] case[s] and this one.").

### B. Use of deadly force

Once it is established that the release of the canine was not a clear constitutional violation, Plaintiff's other claims must also fail. With respect to the shooting itself, there is nothing to support the conclusion that it is clearly unreasonable for officers to shoot at an individual who has pulled out a gun and is actively shooting at a police dog. Though Plaintiff at times seems to suggest that it was unreasonable to shoot Deweese after he opened fire on the canine, because his "right arm [was] indisputably aimed away from the approaching officers, toward the dog/building," that is just the kind of judicial second-guessing that the Supreme Court has forbidden. Dkt. 38 at 13. "The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay 'would gravely endanger their lives or the lives of others.'" *Sheehan*, 575 U.S. at 612 (quoting *Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 298–299 (1967)). Once Deweese produced his gun and started shooting, it would have only taken a fraction of a second for him to turn towards the officers and start shooting at them too. *See id*. ("The Constitution is not blind to the fact that police officers are often forced to make split-second judgments.") (quotation marks omitted). There is no case law establishing that it is unconstitutional to use deadly force under these circumstances. In fact, the Tenth Circuit has specifically held that "a reasonable officer need not await the glint of steel before taking self-protective action." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (cleaned up).

Because the officers did not recklessly create the need for lethal force by releasing the canine, they are entitled to qualified immunity in this respect too. And because it was not clearly established that the force used in this case was excessive, it necessarily cannot have been clearly established that other officers had any duty to intervene.

## II.    Remaining State Law Claims

Having granted the defendants' motions to dismiss as to all of Plaintiff's federal claims, it would be improper to exercise jurisdiction over any remaining state claims, particularly where at least some of those claims are based on a relatively new state law whose contours have not been fully developed. *See* 28 U.S.C. § 1367(c)(3); *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

### CONCLUSION

It is ORDERED that:

Defendants' Motions to Dismiss, **Dkt. 24** and **26**, are **granted**; and

All claims in this action are **dismissed without prejudice**.

DATED: March 21, 2025                BY THE COURT:

~~Daniel~~ D. Domenico
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-00960-DDD-NRN

ESTATE OF WILFORD DEWEESE,

      Plaintiff,

v.

RONNIE HANCOCK,
DANIEL LEBARON,
LEVI HOOVER, and
JEFFREY SCHUELKE,

      Defendants.

---

## FINAL JUDGMENT

---

In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is entered.

Pursuant to and in accordance with Fed. R. Civ. P. 58(a) and the Order Granting Motions to Dismiss, filed March 21, 2025, by the Honorable Daniel D. Domenico, United States District Judge, and incorporated herein by reference as if fully set forth, it is hereby

ORDERED that judgment is hereby entered in favor of Defendants, Ronnie Hancock, Daniel LeBaron, Levi Hoover, and Jeffrey Schuelke, and against Plaintiff, Estate of Wilford Deweese, on Defendants' motions to dismiss. It is further

ORDERED that Plaintiff's complaint and action are dismissed without prejudice.

1

DATED at Denver, Colorado this <u>21st</u> day of March, 2025.

FOR THE COURT:

JEFFREY P. COLWELL, CLERK


*s/ Robert R. Keech*

Robert R. Keech,
Deputy Clerk